**DARNET REALTY ASSOCIATES, LLC, as successor in interest to Darnet Realty Associates, and Darnet Realty Associates, Plaintiffs–Appellants,**

v.

**136 EAST 56TH STREET OWNERS, INC., Defendant–Appellee,**

**City & Suburban Federal Savings Bank, Defendant.**

Docket Nos. 97–9077 (L), 97–9437(CON).*

United States Court of Appeals, Second Circuit.

Argued May 11, 1998.

Decided Aug. 12, 1998.

* Initially defendant-appellee ("Owners") had filed notice of a cross-appeal (Docket No. 97–9145), which the litigants then stipulated in an October 14, 1997 filing was withdrawn from our consideration, without prejudice to its possible future reinstatement after the district court had resolved the issue of attorneys' fees (A.76–77). After that ruling plaintiffs-appellants did reinstate their appeal covered by the same stipulation (A.4–5) but Owners did not reinstate its cross-appeal, and Owners' appellee's brief neither referred to nor argued that cross-appeal. We therefore dismiss Docket No. 97–9145.

Allen H. Brill, Brill & Meisel, New York City (Robert F. Martin, Brill & Meisel, New York City, on the brief), for Plaintiffs–Appellants.

Ted Poretz, Richards & O'Neil, LLP, New York City, for Defendant–Appellee.

Before: WALKER and McLAUGHLIN, Circuit Judges, and SHADUR,** Senior District Judge.

SHADUR, Senior District Judge:

Darnet Realty Associates ("Associates") and its successor Darnet Realty Associates, LLC ("Associates LLC") (collectively "Darnet")[1] appeal from judgments entered on July 29, 1997 and October 28, 1997 in the United States District Court for the Southern District of New York that (1) granted summary judgment in favor of 136 East 56th Street Owners, Inc. ("Owners," treated as a singular noun) under Fed.R.Civ.P. ("Rule") 56 on that part of Owners' claim that asserted it had properly terminated the garage portion of its lease to Darnet pursuant to Section 3607 of the Condominium and Cooperative Conversion Protection and Abuse Relief Act (the "Act," 15 U.S.C. §§ 3601–3616[2]), (2) denied Darnet's cross-motion for summary judgment as to termination of the garage portion of the lease and (3) awarded

---

** The Honorable Milton I. Shadur, of the United States District Court for the Northern District of Illinois, sitting by designation.

1. In 1995 Associates transformed itself into Associates LLC, a new entity that differed only in form, not in substance. For convenience we refer to Associates and Associates LLC collectively as "Darnet" except in the one instance in which the separate existence of the two entities is at issue.

2. All citations to provisions of the Act will take the form "Section—," referring to the Title 15 numbering rather than the Act's internal numbering.

Owners $50,941.10 in attorneys' fees under Section 3611. For the reasons set forth below we (1) reverse the district court insofar as it granted Owners' Rule 56 motion and denied Darnet's Rule 56 motion, (2) reverse the award of attorneys' fees to Owners and (3) remand for consideration of whether Darnet should be awarded attorneys' fees.

### Standard of Review

We review the grant of a motion for summary judgment de novo, using the same standard applied by the district court (*Catlin v. Sobol*, 93 F.3d 1112, 1116 (2d Cir. 1996)). Familiar Rule 56 principles impose on a party seeking summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose we must draw all inferences in favor of the non-moving party, but "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment" (*Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996)).

Where as here cross-motions for summary judgment are involved, it is necessary to adopt a Janus-like dual perspective that sometimes forces a denial of both motions. In this instance, however, the differing perspectives on the parties' respective Rule 56 motions point to the same outcome: Darnet prevails on each motion.

### Facts

136 East 56th Street is an apartment complex in Manhattan that comprises 149 residential apartments, an underground parking garage and a number of retail stores. In 1980 Darnet, then a partnership that owned the entire complex, decided to convert the 149 residential apartments into a cooperative. Accordingly, Darnet incorporated Owners in 1980 and filed an offering plan with the New York State Attorney General on July 24, 1981. Under the plan shares of stock in Owners were offered for sale along with leases to the residential apartments. On the April 16, 1982 closing date Owners took fee simple title to the property and entered into a Master Commercial Lease (the "Lease") with Darnet covering the retail stores, parking garage and ancillary cellar space. At that time Darnet controlled at least 80% of Owners' stock. Under the Lease Darnet was demised the leased premises for a 20–year term at an annual rent of $250,000, with options to renew the Lease for two additional 15–year periods at respective annual rents of $275,000 and $300,000.

Darnet, which still held a substantial portion of Owners' stock (always more than 25%) because the stock had not been sold to cooperative purchasers, maintained control of the board of directors of Owners ("Board") until 1988. At that time five of Board's seven members were elected by shareholders unrelated to Darnet, though Darnet's ownership interest continued to exceed 25%. Darnet never regained a voting majority of Board after that point, but Asher B. Dann ("Dann"), a Darnet partner, served as Owners' President until November 2, 1995. Other facts bearing on whether Darnet might be said to have retained "special developer control" (a statutory concept) will be fleshed out in greater detail in the later substantive discussion.

On July 12, 1995 Associates took advantage of New York's newly enacted Limited Liability Company Act and transformed itself into Associates LLC. All partners in Associates transferred and assigned their partnership interests to Associates LLC in exchange for membership in the new legal entity. As a consequence, Associates LLC acquired all partnership interests in Associates and became its successor in interest.

On May 16, 1996 the owners of more than two-thirds of Owners' units not controlled by Darnet voted at their annual meeting to terminate the Lease to the fullest extent permitted by Section 3607. On May 31, 1996 Owners mailed two notices of termination, assertedly pursuant to Section 3607, that Darnet received in early June. By their terms, one notice said that it terminated the Lease in its entirety while the second said that it terminated only the "garage portion" of the Lease. Each notice said that it would be effective on August 31, 1996.

On November 30, 1996 Darnet sold its entire interest in Owners, but not its control over the parking garage and retail stores, to an unrelated entity, 56 Realty Co. ("56 Realty"). That sale marked the first time that Darnet had less than 25% ownership of Owners' shares (or Owners' units).

On August 2, 1996 Darnet filed a complaint against Owners seeking (1) a judgment declaring the purported termination invalid, (2) an injunction against future attempts to terminate the Lease and (3) attorneys' fees. Owners countered by filing its own action against Darnet seeking a judgment declaring its termination valid and asking for an award of attorneys' fees.[3] Those two actions were then consolidated by the district court.

Owners and Darnet promptly filed cross-motions for summary judgment in both suits. On January 30, 1997 the district court issued an opinion that granted Owners' motions in large part. It rejected Darnet's arguments that Owners' termination notices were not timely under Section 3607(b) and that Owners could not terminate the garage portion of the Lease because the garage was not "property serving" the owners as required by Section 3607(a). Consequently the district court held that Owners' termination of the garage portion of the Lease was valid—although the court granted Darnet's Rule 56 motions to the extent that it ruled that Owners could terminate only the garage portion of the Lease, not the entire Lease.

As the Lease did not apportion Darnet's rent payments between the garage and the retail stores, the district court held an evidentiary hearing to determine the relative value of each portion of the Lease. On July 24, 1997 the district court entered judgment determining that the garage portion represented 21.57% of the value of the Lease and reduced Darnet's rent payments accordingly.

Both Owners and Darnet then moved for awards of attorneys' fees and expenses under Section 3611. On October 27, 1997 the district court denied Darnet's application after finding that Darnet was not the prevailing party in its suit and granted Owners' application as plaintiff in its suit to the extent of awarding Owners $50,941.10—half of its claimed attorneys' fees and expenses.

On November 12, 1997 Darnet filed a timely appeal in this Court. Owners did not appeal the decision that it could not terminate the non-garage portion of the Lease.

### Darnet's Section 3607(b) Appeal

Congress passed the Act in 1980 in an effort to prevent specific abusive practices from occurring in the cooperative and condominium conversion process (see H.R. Conf. Rep. No. 96–1420, at 162, reprinted in 1980 U.S.C.C.A.N. 3506, 3707–08). Congress was particularly concerned with the activities of many developers in the 1970's who imposed "sweetheart" lease arrangements and self-dealing contracts as a condition of sale. Those developers took advantage of the temporary control they frequently exerted over owners' corporations to bind the owners to lengthy and often unfair leases or service contracts running to the developers (see *181 E. 73rd St. Co. v. 181 E. 73rd Tenants Corp.*, 954 F.2d 45, 47–48 (2d Cir.1992)).

Section 3607 was an important part of the Act's legislative scheme to protect owners from such arrangements. Congress armed owners with a potent right "to terminate self-dealing leases without having to resort to judicial action" (*181 E. 73rd St.*, 954 F.2d at 48). Owners could nullify developer "sweetheart" deals (as defined by Section 3607(a)) without proving that they were either unconscionable or one-sided (*id.*).

Section 3607, however, does not give owners a completely open-ended right to nullify self-dealing contracts imposed by developers. Section 3607(b) has a built-in constraint that proves crucial to this case:

> Any termination under this section may occur only during the two-year period beginning on the date on which—
>
> (1) special developer control[4] over the association is terminated; or

---

3. *Owners also sued City and Suburban Federal Savings Bank ("Bank"), the leasehold mortgagee, but Bank is not a party to this appeal.*

4. *This opinion will treat that statutory concept as a term of art, but without the use of quotation marks.*

(2) the developer owns 25 per centum or less of the units in the conversion project,

whichever occurs first.

That statute represents a congressional balancing act. Owners were granted a limited two-year window within which to terminate developer contracts, but Congress ensured that the clock started to run on the owners' right to act only after developers no longer had the ability to control the owners' organization through the statutory concept of special developer control or through what could constitute practical working control via sheer force of numbers.[5]

Darnet's primary argument on appeal is that Owners was not eligible to terminate any part of the Lease on May 31, 1996 because Owners' window of opportunity had opened and closed years earlier. Darnet contends that it lost special developer control of Board in May 1988 when it lost its voting majority and that therefore Owners' eligibility to invoke Section 3607 ran out two years later in May 1990.

While Owners acknowledges that Darnet lost its Board majority in 1988, it disputes whether that fact alone means that Darnet lost special developer control over Owners for Section 3607(b) purposes. Instead, Owners argues that Darnet retained special developer control because Owners' corporate documents gave Darnet substantial ability to control Owners even without controlling Board.[6]

Darnet's suggestion that losing control of a voting majority of a cooperative's board is synonymous with losing special developer control is not supported by the term's statutory definition in Section 3603(22):

> "[S]pecial developer control" means any right arising under State law, cooperative or condominium instruments, the association's bylaws, charter or articles of association or incorporation, or power of attorney or similar agreement, through which the developer may control or direct the unit owners' association or its executive board. A developer's right to exercise the voting share allocated to any condominium or cooperative unit which he owns is not deemed a right of special developer control if the voting share allocated to that condominium or cooperative unit is the same voting share as would be allocated to the same condominium or cooperative unit were that unit owned by any other unit owner at that time.

That broad definition encompasses every means by which, in the language of the statute, "the developer may control or direct the unit owners' association or its executive board." As *305 East 40th Garage Corp. v. 305 East 40th Owners Corp.*, 833 F.Supp. 991, 996 (S.D.N.Y.1993) observed, that "broad and inclusive language . . . . would be a strange way indeed to express the simple idea that special developer control means control of a majority of a board of directors."

Section 3603(14) further clarifies that Congress did not mean simply to equate special developer control with a developer's voting majority of an owners association's board. That section provides that a successor to the original developer may still be considered a "developer" for purposes of the Act if that person:

---

5. That delay also serves an additional purpose, particularly where the prospect for developer abuses was not so one-sided. Congress recognized that self-dealing leases might also allow developers to sell units at substantially lower prices and that at the early stages of conversion a sponsor would bear the brunt of the cost of such self-dealing arrangements to the extent that it owned large numbers of unsold units (*Park South Tenants Corp. v. 200 Central Park South Assocs., L.P.*, 748 F.Supp. 208, 213–14 (S.D.N.Y.1990), aff'd per curiam, 941 F.2d 112 (2d Cir.1991)). Therefore, withholding the owners' right to terminate the lease for some time also ensured that such non-abusive practices could continue.

6. Owners also suggests that Darnet controlled Board even after Darnet lost its majority because Dann, one of Darnet's partners, served as Board President until November 2, 1995. But Owners offers no proof to support the notion that Dann managed to control Board despite Darnet's control of only two out of seven votes. Furthermore, Board could have replaced Dann (or any other officer of Owners) at any time with a majority vote. In the absence of probative evidence, Owners' bare assertion does not raise a genuine issue of material fact.

has the authority to exercise special developer control in the project including the right to: add, convert, or withdraw real estate from the cooperative or condominium project, and maintain sales offices, management offices and rental units; exercise easements through common elements for the purpose of making improvements within the cooperative or condominium; or exercise control of the owners' association.

In that context special developer control encompasses powers that a developer could possess independent of its ability to keep a voting majority on the owners association's board. We see no reason why special developer control (defined in Section 3603(22) only in terms of how "the developer may control or direct" an owners' association or executive board) should be read more narrowly in Section 3607(b) than the examples given in Section 3603(14).

Darnet offers no language from the Act in support of its statutory interpretation. Instead Darnet argues that we are bound by language in cases such as *2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247, 1253 (2d Cir.1991), *West 14th St. Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 200 (2d Cir.1987) and *Brabert Realty Co. v. 20125 Owners Corp.*, 703 F.Supp. 314, 316–17 (S.D.N.Y.1989) that found special developer control existed when a developer had control of the owners association's board.

But while those cases undoubtedly confirmed the self-evident proposition that a developer's majority board control would *suffice* to constitute special developer control, none of those courts had to decide whether— and none did decide that—such majority control was a *necessary* condition to the existence of special developer control. Both *2 Tudor City*, 924 F.2d at 1252–53 and *Brabert*, 703 F.Supp. at 316–17 addressed the question whether special developer control ceased on the date of conversion, rather than continuing until an independent board was elected. Each decision found that special de-

veloper control lasted while the developer controlled the owners' board, but neither had occasion to consider whether other factors could cause special developer control to last beyond that point. Similarly, *West 14th St.*, 815 F.2d at 200 merely found that special developer control had existed when certain contracts were signed because the sponsor had still controlled the board at that point. None of those cases casts any light on the question whether other forms of continued developer power over an owners' association or its board might also qualify as special developer control.

By contrast, courts that have faced the latter issue have consistently treated control of a board majority as a nonexclusive means of special developer control (see, e.g., *305 East 40th*, 833 F.Supp. at 995–97; *Barnan Assocs. v. 196 Owner's Corp.*, 797 F.Supp. 302, 306–07 (S.D.N.Y.1992); *Park South*, 748 F.Supp. at 213; *Coliseum Park Apartments Co. v. Coliseum Tenants Corp.*, 742 F.Supp. 128, 136 (S.D.N.Y.1990)).[7] Those cases have recognized that while developer board control may hold the greatest potential for abuse, developers have other means by which they may "direct or control" the management of an owners' association. In particular, developers have the ability to insert provisions into a new conversion's corporate documents that allow the developer to retain substantial control over the project even after losing majority control of its board. Those corporate documents, like the self-dealing sweetheart deals whose termination the Act was designed to permit, are crafted during the conversion process at the peak of the developer's control over the fledgling condominium or cooperative.

As a consequence, courts have scrutinized the nature of developers' retained powers over owners to assess whether special developer control existed. Those courts have sought to draw the distinction between powers that enabled the developer simply to protect the property-by managing its daily

---

7. *Barnan*, 797 F.Supp. at 306–07 recognized that *West 14th Street* had "equated special developer control with developer domination of the board of directors," but the court nonetheless examined the merits of the argument that there were other

ways for developers to hold special developer control. On the facts of the case, however, the court found that the developer had not retained any broad powers that would equate to such control.

operations and superintendence-and those that gave the developer "substantial control over the business affairs" of the owners' association (*Coliseum,* 742 F.Supp. at 136).

For example, *Barnan,* 797 F.Supp. at 307 (contrasting the developer's broader retained powers in *Coliseum* ) held that no special developer control existed when the developer retained power only:

> (1) to maintain, repair, and alter the Building without the board's consent in the event that an "emergency condition" exists; and (2) to contract for services, purchase supplies, pay bills, and control employees without full review by the board. Furthermore, defendant [Owner's Corp.] points to provisions in the Plan [of conversion] which limit ... the board's ability to reduce the number of employees, services, equipment and insurance coverage until 50% of the shares are owned by the tenant-shareholders.

Those reserved powers were found to do no more than protect the developer's legitimate concern (as generally the largest single unit-owner and the most concerned with future sales of units) with the maintenance of the building, and hence not to rise to the level of special developer control.

On the other hand, *305 East 40th* and *Park South* found that special developer control existed in situations where the developers retained significantly broader and more management-oriented rights than in *Barnan.* In *305 East 40th,* 833 F.Supp. at 997 the developer had veto powers over the owners' ability to amend the owners' association by-laws, to increase or alter the mortgage indebtedness, to enter into any new mortgage or a contract to sell or lease the property, to increase reserves, to hire additional employees and to provide new services. Similarly, in *Park South,* 748 F.Supp. at 213 the cooperative's governing documents gave the developer veto power over leases for the building, capital improvements, refinancing, augmentation of the reserve fund, employee hiring, repairs, provision of services and equipment procurement. Those pervasive management checks gave the developers the chance to frustrate the purposes of Section 3607 by interfering with the owners' ability to manage their affairs, thus constituting special developer control (*id.*).

For present purposes we need not (and do not) decide whether each (or any) of those decisions drew the line at precisely the right place. Here it is plain that Darnet drafted Owners' governing documents in such a way as to retain significant clout over Owners' affairs independent of Darnet's direct voting influence over Board. First and foremost, Darnet had the right to veto any change to either Owners' certificate of incorporation ("Certificate") or its by-laws as long as Darnet held even one share in Owners.[8] That assured Darnet's ability to block any amendments to the supermajority voting or quorum requirements that affected numerous business matters of Owners, including transacting any business involving the lease or sale of the building, amending or canceling proprietary leases, changing Board's composition, compensation or powers and limiting the powers of Owners' directors and officers. Those supermajority provisions enabled Darnet to control Owners' decisions on those issues.

Certificate Art. Ninth § (c)(viii) also gave Darnet major veto powers as long as Darnet held at least 25% of Owners' shares:

> So long as the Unsold Shares constitute 25% or more of the outstanding shares of the Corporation, the approval of the shareholders owning at least 75% of the shares of the Corporation ... shall be required before the Board of Directors may take any of the following actions:

---

8. Certificate Art. Tenth provided in relevant part:
[S]o long as there are any Unsold Shares outstanding, the written consent or vote of 100% of all shareholders shall also be required for any amendment, alteration, repeal or addition to the Certificate of Incorporation which would, directly or indirectly, have an adverse affect on the rights or interests of any holder of a block of Unsold Shares.

Similarly, Certificate Art. Ninth § (c)(vi) contained a like exception to the two-thirds vote on by-laws amendments:
[S]o long as there are any Unsold Shares outstanding, the By–Laws may not be amended, altered, repealed or added to without the written consent or vote of 100% of all shareholders.

(a) increase the number or change the type of employees from that described in the Corporation's budget for the first year of cooperative operation ...; (b) provide for new or additional services from those indicated in said first year's budget ...; (c) impose any maintenance or other charge (regular or special) against the Corporation's shareholders for the purpose of making any capital or major improvement or addition, unless required by law; or (d) establish any reserves in addition to the Corporation's Working Capital Fund ... other than a 12–month reserve for contingencies not exceeding five (5%) percent of the budgeted operating expenses (exclusive of mortgage debt service) for the ensuing 12 months of cooperative operation.

Those veto rights were reinforced by an accompanying certificate provision, Certificate Art. Ninth § (a)(viii), that required 75% of Owners' shareholders to make up a quorum for any such transactions.

Darnet disputes whether its veto powers conferred by Certificate Art. Ninth § (c)(viii) survived after 1984. Darnet points out that Owners' by-laws, offering plan and proprietary leases all included a substantively identical provision, but with one key difference: Those documents contained an additional clause that terminated Darnet's veto power over those business matters two years after Owners' closing date of April 16, 1982. Darnet argues that those corporate documents reflected the true agreement between Darnet and Owners as to the extent of Darnet's powers.

There is no way to read Owners' Certificate consistently with those other documents—either the sunset clauses ended Darnet's rights or they did not. Owners rely on the general rule that the Certificate controls over the other corporate agreements, urging that *Christal v. Petry*, 275 A.D. 550, 557–58, 90 N.Y.S.2d 620, 627 (1949), *aff'd* 301 N.Y. 562, 93 N.E.2d 450 (1950) and *Lasker v. Moreida,* 38 Misc.2d 348, 356–57, 238 N.Y.S.2d 16, 24 (N.Y.Sup.1963), *aff'd* 20 A.D.2d 627, 246 N.Y.S.2d 188 (1963) mandate that as a matter of law inconsistencies between a corporation's certificate of incorporation and its by-laws must always be resolved in favor of the certificate. For its part, Darnet points to later New York holdings that under some circumstances shareholder agreements, whether expressed through by-laws, other shareholder contracts or a course of conduct, may overcome the presumption that the certificate controls over any contradictory corporate document (see *Zion v. Kurtz*, 50 N.Y.2d 92, 99–103, 428 N.Y.S.2d 199, 405 N.E.2d 681, 683–86 (1980)(applying Delaware corporate law but indicating New York law would reach the same result); *Garson v. Garson,* 105 A.D.2d 726, 728–29, 481 N.Y.S.2d 162, 164–65 (1984)(New York law, relying on *Zion* ), *aff'd sub nom. Garson v. Rapping,* 66 N.Y.2d 928, 498 N.Y.S.2d 796, 489 N.E.2d 765 (1985)(also citing *Zion* ); *Adler v. Svingos,* 80 A.D.2d 764, 765, 436 N.Y.S.2d 719, 721 (1981)(citing and quoting *Zion* ); cf. the earlier decision in *Millspaugh v. Cassedy,* 191 A.D. 221, 226–27, 181 N.Y.S. 276, 280–81 (1920)). That equitable doctrine prevents the elevation of form over substance when there is clear and unambiguous evidence that a later agreement was meant to override the certificate (*Sutton v. Sutton,* 196 A.D.2d 411, 413–14, 601 N.Y.S.2d 106, 108 (1993), *aff'd* 84 N.Y.2d 37, 614 N.Y.S.2d 369, 637 N.E.2d 260 (1994)).

But we need not decide whether or not the sunset provision survives despite its absence from the Certificate, nor what effect the enforceability of the clause would have on the perpetuation of special developer control. That is because Owners itself argues affirmatively that special developer control continued well after the election of an independent Board in May 1988. As we explain below, that position proves fatal to Owners' ability to demonstrate that its termination notices complied with the requirements of Section 3607(b). In terms of Owners' consistent arguments throughout this litigation, Darnet has retained its special developer control without interruption even after the independent Board election in 1988, so that the earliest triggering event for Owners' right to terminate the Lease under Section 3607(b) had to be the second of that section's two alternatives: the date when Darnet's share

of the units in Owners dropped to 25% or less. And that event clearly did not take place until November 30, 1996, when Darnet sold its entire interest in Owners to 56 Realty.

Owners obviously paid no heed to the unambiguous directive of Section 3607(b): Under its view of the parties' relationship Darnet still had special developer control in May 1996 (had that not been so, Owners' termination right would long since have expired under Section 3607(b)(1)), and it was beyond question that Darnet (or more precisely, Associates and then Associates LLC) had always held—and then held—more than 25% of the shares (and units) in Owners. Yet Owners inexplicably served notices of termination on May 31, 1996—*before* its right to take such action had arisen under its own scenario. Again inexplicably, that patent noncompliance with the statutory precondition to any attempted termination of the Lease never surfaced before the district court. It was not until this court raised the matter that Owners' counsel was compelled to come to grips with the fact that Owners had painted itself into a corner.

■ At that point Owners' counsel sought to assert at oral argument that Associates' transfer and assignment of all of its shares in Owners to Associates LLC on July 12, 1995 had somehow opened Owners' window to act under Section 3607(b)'s second trigger point. That just won't work, for it is equally plain that Associates LLC simply stands in Associates' legal shoes, so that the 1995 assignment was a nonevent in Section 3607(b) terms. Section 3603(14) defines "developer" as encompassing not only the original developer but also:

> any successor of such person who offers to sell or sells his interests in units in a cooperative or condominium project and who has the authority to exercise special developer control in the project....

Associates LLC fits squarely within that definition: It assumed all of Associates' powers over Owners (and thus enjoyed the identical level of special developer control), and it eventually sold its units to another party (this time an unrelated entity). Indeed, Owners' belated advancement of its untenable position is wholly at odds with its prior consistent treatment of Associates LLC and Associates as the same entity for purposes of this action. In sum, the transfer of shares in Owners between the two entities—truly the same continuing entity except in terms of their formal structure—did not open the statutory termination window.

Owners is thus hoist by its own petard. By Owners' own argument, Darnet maintained special developer control after 1988. This is fatal to Owners' claim, because it means that neither of Section 3607(b)'s triggering events took place before May 31, 1996. That being so, Owners' attempted termination of any part of the Lease on that date was a nullity as a matter of law. On the position put forward by Owners, then, termination was too early, while on Darnet's characterization of events termination came too late. Either way, we must reverse the district court and grant Darnet's motion for summary judgment.

We note parenthetically Darnet's somewhat ironic failure to recognize immediately the happy (from its perspective) consequence of losing on its original argument that its special developer control had terminated in 1988 or earlier (so that Owners' termination notices would have been impermissibly late under Section 3607(b)(1)). It was not until Darnet tendered its supplemental brief, requested by our panel at oral argument, that it contended that neither of the conditions precedent for termination under Section 3607(b) had occurred before May 31, 1996.

■ Owners now urges in response that Darnet cannot rely upon that argument on appeal because it was not raised before the district court. But that position is just as defective as the timing of Owners' notices. Effectively Owners' contention treats the Section 3607(b) requirements as if they were akin to a statute of limitations and therefore waivable. But Section 3607(b) is not a mere statute of limitations: We have already said in *Park South*, 941 F.2d at 114 that "Section 3607(b) expressly creates a two-year window during which cooperative owners can invoke the termination right"—a statutorily limited period of time that defines when and only

when any owners may attempt to terminate developers' contract rights. Opening that window is a Congress-mandated precondition to the existence of any claim by Owners,[9] and as such an attempted notice of termination that is given either before or after the statutory window opens is an incurable defect that Darnet cannot waive and that we may not ignore.

### Darnet's Section 3607(a) Appeal

Darnet has also argued on appeal that Owners could not terminate the garage portion of the Lease because the parking garage was not "property serving" Owners as required by Section 3607(a)(1).[10] But Owners' failure to comply with the Section 3607(b) precondition to any claim based on an attempted termination eliminates any case or controversy in that respect—it would call for a purely advisory opinion on that score. We therefore express no opinion on the merits of that contention.

### Attorney's Fees under Section 3611

Because Owners is no longer the prevailing party in either of the two consolidated actions in any sense, it is not eligible for an award of attorneys' fees under Section 3611 (*305 E. 24th Owners Corp. v. Parman Co.,* 994 F.2d 94, 96–97 (2d Cir.1993)(per curiam)). We thus vacate the district court's award of such fees to Owners.

Conversely, Darnet now stands as the prevailing party and is statutorily eligible for reasonable fees under Section 3611(d). We therefore reverse the district court's denial of Darnet's application for attorneys' fees and remand to the district court for a determination of whether it would be fair, just and equitable to award any such fees and, if so, in what amount.

### Conclusion

Owners' attempts to terminate the Lease were wholly invalid because they did not come within the limited window of time specified in Section 3607(b). Accordingly we REVERSE the district court's rulings granting Owners' Rule 56 motion and denying Darnet's like motion, and we order the district court to grant Darnet's cross-motion under Rule 56 as a matter of law. Because Darnet and not Owners is now the prevailing party, we REVERSE the award of attorneys' fees to Owners and vacate the denial of Darnet's application for such fees. We REMAND this case to the district court for its determination as to whether Darnet is entitled to attorneys' fees under Section 3611 in light of this decision.

---

9. Note again the statutory language:

> Any termination under this section may occur *only* during the two-year period beginning on the date on which [the earlier of the two defined events] occurs . . . .

10. Section 3607(a)(1) allows tenants to terminate a contract only if it "provides for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such a project."