**DARNET REALTY ASSOCIATES LLC, as successor in interest to Darnet Realty Associates, and Darnet Realty Associates, Plaintiffs–Appellants Cross–Appellees,**

v.

**136 EAST 56TH STREET OWNERS, INC., Defendant–Appellee–Cross–Appellant.**

**Docket Nos. 99–7853(L), 99–7885(XAP)**

United States Court of Appeals, Second Circuit.

Argued March 1, 2000

Decided May 17, 2000

Allen H. Brill, Brill & Meisel, New York, NY, for Plaintiffs–Appellants–Cross–Appellees.

Ted Poretz, Richards & O'Neil, LLP, New York, NY (Alyson M. Weiss, New

York, NY, of counsel), for Defendant–Appellee–Cross–Appellant.

Before: McLAUGHLIN, STRAUB, and SACK, Circuit Judges.

SACK, Circuit Judge:

Plaintiff–Appellant–Cross–Appellee Darnet Realty Associates LLC ("Darnet") appeals, and Defendant–Appellee–Cross–Appellant 136 East 56th Street Owners, Inc. ("Owners") cross-appeals, from a June 21, 1999 judgment of the United States District Court for the Southern District of New York (Leonard B. Sand, *Judge*). Darnet appeals from the portion of the judgment (1) declaring valid two notices of termination served pursuant to the Condominium and Cooperative Conversion Protection and Abuse Relief Act of 1980; (2) limiting its attorneys' fees in two previous actions to $78,439.00; and (3) awarding Owners attorneys' fees in the amount of $98,849.13. Owners cross-appeals from the portion of the judgment awarding attorneys' fees to Darnet. We affirm.

## BACKGROUND

The underlying facts of this case, which are not in dispute, are described in an earlier opinion of this Court. *See Darnet Realty Assocs., LLC v. 136 East 56th St. Owners, Inc.*, 153 F.3d 21, 23–24 (2d Cir. 1998). We rehearse the facts here only insofar as necessary to explain our decision on this second appeal.

In 1980 Darnet, the owner of a building at 136 East 56th Street in midtown Manhattan, decided to convert the building into a cooperative. *See id.* at 23. Pursuant to a conversion plan filed with the New York State Attorney General, Darnet conveyed to Owners fee simple title to the building on April 16, 1982. *See id.* As part of the transaction, Owners leased to Darnet the building's non-residential space—retail stores, a parking garage, and ancillary cellar space—for twenty years at an annual rent of $250,000, renewable by Darnet for two additional fifteen-year terms at respective annual rents of $275,000 and $300,000. *See id.* After Owners took title, Darnet continued to hold a majority of the votes on Owners' board of directors until May 1988. *See id.* at 23, 25. Darnet's ownership share in the building's units did not fall below twenty-five percent until October 30, 1996.[1] *See 136 East 56th St. Owners, Inc. v. Darnet Realty Assocs., LLC,* Nos. 98 Civ. 5864 (LBS), 98 Civ. 6011 (LBS), 1999 WL 47328, at *2 n. 4, 1999 U.S. Dist. LEXIS 970, at *8 n. 4 (S.D.N.Y. Feb. 1, 1999).

On May 31, 1996, Owners sent Darnet two notices of termination (the "1996 notices")—one seeking to terminate the lease in its entirety and the second seeking to terminate the lease only as to the parking garage—pursuant to the Condominium and Cooperative Conversion Protection and Abuse Relief Act of 1980 (the "Act"), 15 U.S.C. §§ 3601–3616. *See Darnet,* 153 F.3d at 23. As we explained:

> Congress passed the Act in 1980 in an effort to prevent specific abusive practices from occurring in the cooperative and condominium conversion process. Congress was particularly concerned with the activities of many developers in the 1970's who imposed "sweetheart" lease arrangements and self-dealing contracts as a condition of sale. Those developers took advantage of the temporary control they frequently exerted over owners' corporations to bind the owners to lengthy and often unfair leases or service contracts running to the developers.

*Id.* at 24 (citations omitted); *see also 181 East 73rd St. Co. v. 181 East 73rd St.*

---

1. The district court has politely reminded us that our reference to this date as November 30, 1996 in our prior opinion, *Darnet,* 153 F.3d at 24, was off by a month. *See 136 East 56th St. Owners, Inc. v. Darnet Realty Assocs.,* *LLC,* Nos. 98 Civ. 5864 (LBS), 98 Civ. 6011 (LBS), 1999 WL 47328, at *2 n. 4, 1999 U.S. Dist. LEXIS 970, at *8 n. 4 (S.D.N.Y. Feb. 1, 1999).

*Tenants Corp.,* 954 F.2d 45, 47–48 (2d Cir.1992) (describing purpose of the Act). Both Owners and Darnet filed actions in the district court seeking declaratory judgments as to the validity of the 1996 notices. The district court ruled that the notices were valid, but only as to the garage portion of the lease. *See Darnet Realty Associates., LLC v. 136 East 56th St. Owners, Inc.,* Nos. 96 Civ. 5825 (LBS), 96 Civ. 5889 (LBS), 1997 WL 37926, at *10, 1997 U.S. Dist. LEXIS 889, at *31–*32 (S.D.N.Y. Jan. 30, 1997).

We reversed. Under 15 U.S.C. § 3607(b), unit owners have a two-year window in which to terminate a self-dealing lease. The window is opened by the earlier of two events: (1) the end of "special developer control," which the Act defines as "any right arising under State law, cooperative or condominium instruments, the association's bylaws, charter or articles of association or incorporation, or power of attorney or similar agreement, through which the developer may control or direct the unit owners' association or its executive board," 15 U.S.C. § 3603(22); or (2) a drop in the developer's ownership share in the building's units to twenty-five percent or less. *See* 15 U.S.C. § 3607(b). In reversing the district court, we held that Darnet's "special developer control" did not end with its loss of a majority of the votes on the building's board of directors in 1988,[2] and that as a result § 3607(b)'s two-year window must have opened when Darnet's ownership share in the building's units dropped below twenty-five percent on October 30, 1996. *See Darnet,* 153 F.3d at 28–29. Because the service on Darnet of Owners' 1996 notices preceded this date by several months, we concluded that the 1996 notices were untimely and invalid. *See id.* We also vacated the district court's attorneys' fees award, which was premised on Owners' success in the dis-

trict court, and remanded the case to the district court for it to determine whether Darnet should now recover attorneys' fees. *See id.* at 30.

In June 1998, after we had heard oral argument but before we issued our decision on the first appeal, Owners served Darnet with two additional notices of termination (the "1998 notices"), one purporting to terminate the lease to the fullest extent permitted by law and the other only the garage portion of the lease. Both Darnet and Owners again filed actions seeking determinations of the validity of this new set of notices, and the district court again concluded that both notices were valid as to the garage portion of the lease. *See 136 East 56th St. Owners,* 1999 WL 47328, at *7, 1999 U.S. Dist. LEXIS 970, at *24–*25. In a separate memorandum and order, the district court awarded attorneys' fees to Owners based on its success in the action arising from the 1998 notices, and to Darnet based on its (short-lived) success in the actions arising from the 1996 notices. *See Darnet Realty Associates., LLC v. 136 East 56th St. Owners, Inc.,* Nos. 96 Civ. 5825 (LBS), 96 Civ. 5889 (LBS), 98 Civ. 5864 (LBS), 98 Civ. 6011 (LBS), 1999 WL 269960, 1999 U.S. Dist. LEXIS 6380 (S.D.N.Y. May 3, 1999) (as amended).

This appeal and cross-appeal followed.

## DISCUSSION

Three general issues are presented for us to decide: 1) whether the 1998 notices were timely served; 2) whether the parking garage is "property serving" the unit owners so that the lease with respect to it was terminable by Owners; and 3) whether the district court properly awarded attorneys' fees.

---

**2.** In reaching this conclusion, we noted that Darnet had "drafted Owners' governing documents in such a way as to retain significant clout over Owners' affairs independent of Darnet's direct voting influence over Board,"

153 F.3d at 27, but rested our holding on Owners' own concession that "special developer control continued well after the election of an independent Board in May 1988," *id.* at 28.

## I. Whether the 1998 Notices were Timely Served

15 U.S.C. § 3607(b) provides:

Any termination under this section may occur only during the two-year period beginning on the date on which—

(1) special developer control over the association is terminated; or

(2) the developer owns 25 per centum or less of the units in the conversion project,

whichever occurs first.

Darnet argues that Owners' 1998 notices were untimely because they purported to go into effect either (1) after § 3607(b)'s two-year window had already closed, or (2) before § 3607(b)'s two-year window had opened. We disagree.

### A. Too Late?

■ Darnet first argues that "special developer control" ended with the election of an independent board in May 1988, ten years before the 1998 notices purported to become effective. In our earlier decision, we noted that Owners had consistently maintained that "special developer control" extended beyond the 1988 election of an independent board through the Autumn of 1996 when it lost control of twenty-five percent of the units. The 1996 notices were therefore untimely because they were served in May 1996, nearly six months before § 3607(b)'s two-year window had opened. *See Darnet*, 153 F.3d at 28–29. Because Owners was thus defeated by its own argument—"hoist by its own petard," as we said, *id.* at 29—we did not consider whether "special developer control" might in fact have ended in May 1988 with the election of an independent board.

We now hold that it did not. 15 U.S.C. § 3603(22) defines "special developer control" as "any right arising under State law, cooperative or condominium instruments, the association's bylaws, charter or articles of association or incorporation, or power of attorney or similar agreement, through which the developer may control or direct the unit owners' association or its executive board." Even after the 1988 election of an independent board, Darnet retained veto powers that allowed it to exercise such control. As we explained in our previous opinion:

Here it is plain that Darnet drafted Owners' governing documents in such a way as to retain significant clout over Owners' affairs independent of Darnet's direct voting influence over [the Owners'] Board. First and foremost, Darnet had the right to veto any change to either Owners' certificate of incorporation ... or its by-laws as long as Darnet held even one share in Owners. That assured Darnet's ability to block any amendments to the supermajority voting or quorum requirements that affected numerous business matters of Owners, including transacting any business involving the lease or sale of the building, amending or canceling proprietary leases, changing Board's composition, compensation or powers and limiting the powers of Owners' directors and officers. Those supermajority provisions enabled Darnet to control Owners' decisions on those issues.

*Id.* at 27 (footnote omitted).

In the alternative, Darnet argues that if its veto powers are to be considered the decisive measure of "special developer control," then "special developer control" must have ended in 1984, more than fourteen years before Owners' termination notices became effective. Its theory is that these veto powers were subject to a sunset provision contained in both Owners' by-laws and a proprietary lease signed by Darnet. The by-laws version of this provision reads:

So long as the Unsold Shares [of Owners] constitute twenty-five (25%) percent or more of the outstanding shares of the corporation [Owners], *but not later than two (2) years from the date the corporation acquired title to the Property,* the Board of Directors of the corporation shall not take any of the following ac-

tions unless shareholders owning at least seventy-five (75%) percent of the shares of the corporation approve ... (i) increase the number or change the type of employees ...; (ii) provide for new or additional services ...; (iii) impose any rent, maintenance, assessment or other charge ...; (iv) establish any reserves in addition to the Working Capital Fund ....

(emphasis and brackets added). Darnet insists that because it sold 136 East 56th Street to Owners on April 16, 1982, its veto powers expired two years later, on April 16, 1984.

We explicitly declined in our previous decision to decide the validity and effect of this sunset provision. *See id.* at 28. The district court, however, rejected the provision's significance for three independent reasons. We agree with all three.

First, the district court determined that the New York state law rule that a certificate of incorporation takes precedence over an inconsistent proprietary lease or by-law applied to this case. Because Owners' certificate of incorporation contained no sunset provision, the provision in the proprietary lease and by-laws was contrary to the certificate of incorporation and therefore ineffective. *See 136 East 56th St. Owners,* 1999 WL 47328, at *4, 1999 U.S. Dist. LEXIS 970, at *14; *Darnet,* 1997 WL 37926, at *6, 1997 U.S. Dist. LEXIS 889, at *16–*18 (citing *Christal v. Petry,* 275 A.D. 550, 90 N.Y.S.2d 620, 627 (1st Dep't 1949), *aff'd,* 301 N.Y. 562, 93 N.E.2d 450 (1950), and *Lasker v. Moreida,* 38 Misc.2d 348, 238 N.Y.S.2d 16, 24 (Sup. Ct.1963)).

Second, the district court relied on the principle that inconsistencies among documents relating to the same subject matter should be resolved against the drafter of the documents. Darnet drafted the certificate of incorporation, proprietary lease, and by-laws. The inconsistency among them—that the sunset provision appeared

in the proprietary lease and by-laws but not the certificate of incorporation—is therefore to be resolved in Owners' favor. In the context of this case, the result is that the sunset provision was, as Owners contend, ineffective. *See 136 East 56th Street Owners,* 1999 WL 47328, at *4, 1999 U.S. Dist. LEXIS 970, at *14 (citing *305 East 40th Garage Corp. v. 305 East 40th Owners Corp.,* 833 F.Supp. 991, 997–99 (S.D.N.Y.1993)); *Darnet,* 1997 WL 37926, at *6, 1997 U.S. Dist. LEXIS 889, at *19.

Third, the district court concluded that even if the sunset provision was effective, it would not cover Darnet's power to veto amendments to the by-laws and certificate of incorporation. This power alone gave Darnet "special developer control." *See 136 East 56th St. Owners,* 1999 WL 47328, at *4, 1999 U.S. Dist. LEXIS 970, at *14–*15; *Darnet,* 1997 WL 37926, at *7, 1997 U.S. Dist. LEXIS 889, at *19–*20.

In sum, we hold that "special developer control" exercised by Darnet extended beyond 1984, when according to the by-laws and proprietary lease some of Darnet's veto powers expired, and beyond 1988, when an independent board was elected.

*B. Too Early?*

■ Darnet argues in the alternative that assuming "special developer control" did not end in 1982 or 1984, the 1998 notices were nonetheless untimely because § 3607(b)'s two-year window never opened. We assumed otherwise in our previous decision. Our conclusion was premised in part on the view that the two-year window began when Darnet sold its shares in Owners to another entity, 56 Realty Co. ("56 Realty"), and Darnet's interest in Owners, accordingly, dropped below twenty-five percent. *See Darnet,* 153 F.3d at 28–29. Darnet, however, argues that 56 Realty, and the entity that bought 56 Realty's shares on May 8, 1998, 136 Units LLC, are both "successor[s]" under 15 U.S.C. § 3603(14),[3] and that therefore neither of

---

**3.** 15 U.S.C. § 3603(14) provides:

"[D]eveloper" means (A) any person who

§ 3607(b)'s two triggering events has yet occurred.

We reject Darnet's argument for the reasons given by the district court:

> [I]n the instant legal context, the reasonable reading of "successor" encompasses a party who not merely succeeds the original developer in time, but who also can be expected to succeed the original developer in interest pertaining to the self-dealing contract at issue.
>
> . . . .
>
> . . . [W]here a party can neither be said to be controlled by the original developer or be the original developer's alter ego, nor be expected for any other reason to share the original developer's interest in the self-dealing lease, the purpose of the statute is not furthered by a continued tolling of the two year window.

*136 East 56th Street Owners*, 1999 WL 47328, at *6, 1999 U.S. Dist. LEXIS 970, at *19–*21.

The district court then concluded that 136 Units LLC did not meet this definition of "successor." The district court noted that there is no indication that 136 Units LLC shared Darnet's interest in its self-dealing lease, or that Darnet has any interest in 136 Units LLC. Indeed, 136 Units LLC cast its vote in favor of terminating

this lease with Darnet. *See id.* at *6, 1999 U.S. Dist. LEXIS 970, at *22.

We agree with the district court's reasoning and conclusion and hold that § 3607(b)'s two-year window opened on October 30, 1996, when Darnet's interest in Owners dropped below twenty-five percent, and that the 1998 notices, which went into effect less than two years later, were timely.

## II. Whether the Garage is "Property Serving" the Unit Owners

█ In order to be terminable under the Act, a contract must "provide[ ] for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of *property serving the condominium or cooperative unit owners* in such project." 15 U.S.C. § 3607(a) (emphasis added).[4] Darnet argues that the garage portion of the lease between it and Owners does not constitute "property serving the . . . cooperative unit owners" because no preferences for vacant spaces are given to unit owners and few spaces are leased by the unit owners. Therefore, Darnet concludes, § 3607(a) does not give Owners the right to terminate the portion of the lease covering the

offers to sell or sells his interest in a cooperative or condominium unit not previously conveyed, or (B) any successor of such person who offers to sell or sells his interests in units in a cooperative or condominium project and who has the authority to exercise special developer control in the project including the right to: add, convert, or withdraw real estate from the cooperative or condominium project, and maintain sales offices, management offices and rental units; exercise easements through common elements for the purpose of making improvements within the cooperative or condominium; or exercise control of the owners' association.

4. The complete text of 15 U.S.C. § 3607(a) provides:

Any contract or portion thereof which is entered into after October 8, 1980, and which—

(1) provides for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such project;
(2) is between such unit owners or such association and the developer or an affiliate of the developer;
(3) was entered into while such association was controlled by the developer through special developer control or because the developer held a majority of the votes in such association; and
(4) is for a period of more than three years, including any automatic renewal provisions which are exercisable at the sole option of the developer or an affiliate of the developer, may be terminated without penalty by such unit owners or such association.

parking garage. We disagree.[5]

In *West 14th St. Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188 (2d Cir.1987), we rejected the argument that a parking garage was not "property serving" the cooperative under § 3607(a) if it did not serve unit owners exclusively. Reviewing the legislative history of the Act, we concluded that Congress's purpose in enacting the statute was "to protect property providing services primarily for the benefit of the unit-owners," *id.* at 198, and that a parking garage that was open to the public could nonetheless fall within § 3607(a), *see id.* at 199. The conversion offering plan and certificate of occupancy in *West 14th St.* both indicated that parking preferences were to be given to tenants, and we therefore did not decide whether a parking garage "provid[ed] services primarily for the benefit of the unit-owners" when such preferences were not given. But we nonetheless said in *dicta* that "[a] parking garage, *with or without tenant preferences*, provides a service that tenants might reasonably expect as an essential adjunct of their apartment complex." *Id.* at 198–99 (emphasis added); *see also 181 East 73rd St. Co. v. 181 East 73rd St. Tenants Corp.*, 954 F.2d 45, 48 (2d Cir.1992) (noting, without comment as to tenant preferences, that on-site parking garage was "property serving the . . . cooperative unit owners" (internal quotation marks omitted)); *2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247, 1252 (2d Cir.1991) (same).

As we observed in *Board of Managers of the Charles House Condominium v. Infinity Corp.*, 21 F.3d 528 (2d Cir.1994), "[g]iven that parking space in New York City is a scarce commodity, a parking garage in Manhattan can be a veritable gold mine." *Id.* at 531. This is true not only for residents who actually use the parking garage—as a few residents of 136 East 56th Street do—but also for those residents who benefit indirectly from the profits the parking garage generates. And unlike a store that sells food, hardware or clothing, a parking garage provides "a service that tenants might reasonably expect as an essential adjunct of their apartment complex." *West 14th St.*, 815 F.2d at 198–99.

We note, finally, that it would be anomalous were we to hold that a parking garage without tenant preferences is not "property serving . . . the unit owners," and thereby, in effect, to require that in order to protect their interests, developers must *not* provide garage preferences to cooperative and condominium unit owners in the context of a statute designed to protect unit owners. *Cf. id.* at 198 (declining to hold that property must serve cooperative unit owners exclusively to be "property serving" the unit owners in part because "such an interpretation would enable developers in future conversion projects to sidestep the statute simply by eliminating the exclusive nature of any service.")

We hold, as we indicated in *West 14th Street*, that a parking garage "with or without tenant preferences" is "property serving the . . . unit owners." The garage portion of the lease is therefore terminable under § 3607(a).

### III. Attorneys' Fees

Finally, we address the issue of attorneys' fees. Pursuant to 15 U.S.C. § 3611(d),[6] the district court awarded fees to Darnet for its success in the actions

---

5. We declined to reach this issue in our previous decision because "Owners' failure to comply with the Section 3607(b) precondition to any claim based on an attempted termination eliminates any case or controversy in that respect—it would call for a purely advisory opinion on that score." 153 F.3d at 30.

6. 15 U.S.C. § 3611(d) provides: "The amounts recoverable under this section may include interest paid, reasonable attorneys' fees, independent engineer and appraisers' fees, and court costs. A defendant may recover reasonable attorneys' fees if the court determines that the cause of action filed by the plaintiff is frivolous, malicious, or lacking in substantial merit."

based on the 1996 notices, and also awarded fees to Owners for its success with respect to the 1998 notices. We review the district court's decision on an application for attorneys' fees, and the amount awarded, if any, for abuse of discretion. *See Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Haley v. Pataki*, 106 F.3d 478, 481 (2d Cir.1997).

## A. Actions Arising From 1996 Notices

■ After we reversed the district court in our previous decision, *see Darnet*, 153 F.3d at 30, the district court determined that Darnet was entitled to recover attorneys' fees as a prevailing party in the actions based on the 1996 notices, although the court reduced this award by approximately one-half because of (1) the "wasteful and excessively litigious manner" in which the actions were conducted, and (2) "the fact that Darnet never argued to [the district court] the principle on which it ultimately prevailed." *136 East 56th St. Owners*, 1999 WL 269960, at *6, 1999 U.S. Dist. LEXIS 6380, at *19. The district court also awarded Darnet attorneys' fees for its work on appeal, but limited these fees to "the amount of work Darnet performed, at [the Second Circuit's] request, on the argument on which Darnet actually prevailed." *Id.* It thus awarded Darnet only $6,242.50 of the $82,574.25 it had requested for its work on its previous appeal. *See id.* at *5-*6, 1999 U.S. Dist LEXIS 6380, at *18-*19.

Darnet does not challenge the district court's reduction of its attorneys' fee award for its trial work, but it does take issue with the district court's reduction of its award for its work on appeal. Darnet argues that "without Darnet's appeal and all of [the] background, factual material and briefing therein, there would not have been any post-argument issue or briefing at all." We find this argument unpersuasive. It is of course true that had Darnet not chosen to appeal the district court's decision, we would not have had any opportunity to rule for Darnet on appeal.

But there is no basis for concluding that anything in Darnet's initial briefing to us—including its rehearsal of the facts—led to that ruling. As the district court explained, "It was not until the Second Circuit raised the issue and requested supplemental briefing that Darnet first contended that the Notices were premature.... Darnet prevailed on an argument that it did not make until the eleventh hour at the Court's suggestion." *Id.* at *3, 1999 U.S. Dist LEXIS 6380, at *10-*11. We agree with the district court and find nothing improper about its reduction of Darnet's attorneys' fees award on this basis.

Owners, meanwhile, argues that Darnet should not have received *any* attorneys' fees because any success it achieved with respect to the 1996 notices was "fleeting" in light of the district court's ruling against it with respect to the 1998 notices. This argument understates Darnet's earlier success. As the district court pointed out, as a result of its success Darnet was allowed to profit from "not insubstantial" rental payments on the garage lease for a significantly longer period of time than had it failed to have the 1996 notices invalidated. *See id.* at *3; 1999 U.S. Dist. LEXIS 6380, at *9. We therefore affirm the district court's decision to award Darnet attorneys' fees.

## B. Actions Arising From 1998 Notices

■ As for the actions arising from the 1998 notices, the district court determined that in these actions Owners was the prevailing party and that it was therefore entitled to recover attorneys' fees. Darnet's principal argument on appeal is that it, not Owners, was the prevailing party in these actions, and that it, not Owners, was therefore entitled to recover attorneys' fees. We disagree.

Darnet bases its argument on the fact that Owners prevailed only as to the garage portion of the lease, which constituted a relatively small percentage of the total value of the lease, and that it, Darnet, prevailed with respect to the lease's remaining value. But as the district court

pointed out, this issue—the extent of the lease that could be terminated under § 3607(a)—was decided in the actions arising from the 1996 notices, not those arising from the 1998 notices. *See id.* at *4, 1999 U.S. Dist. LEXIS 6380, at *13. We therefore agree with the district court's conclusion that "Darnet cannot obtain prevailing party status where it did not receive a judgment in its favor simply by referencing an issue on which it prevailed in an earlier action." *Id.*

Darnet also argues that § 3611(d) contemplates that only developers would be "successful plaintiffs" entitled to recover attorneys' fees. As the district court noted, this interpretation of § 3611(d) finds no support in either the Act or the case law. *See id.* at *4, 1999 U.S. Dist. LEXIS 6380, at *14–*16.

Last, Darnet challenges the district court's award of attorneys' fees to Owners in the amount of $48,489.94 for work Owners did in the earlier actions that came to fruition in the present matter. *See id.* at *6, 1999 U.S. Dist. LEXIS 6380, at *20. Darnet argues that it, not Owners, was the prevailing party in those earlier actions, and that Owners is therefore not entitled to recover any attorneys' fees based on its earlier work. But as the district court noted, although the actions arising from the 1996 notices and the actions arising from the 1998 notices are distinct, the issues raised in all four actions are nonetheless deeply intertwined. *See id.* at *5, 1999 U.S. Dist. LEXIS 6380, at *17. Darnet cites no case suggesting that in such a situation, the district court's attorneys' fees award to Owners was improper, and we find no abuse of discretion in this aspect of the district court's award.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court in all respects.