**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: April 2, 2008                    Decided: June 5, 2009)

Docket No. 06-4565-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

DENISE H. REIN, Individually and as Executrix of the Estate of MARK ALLEN REIN, Deceased, et al.,

*Plaintiffs*,

v.

THE SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, LIBYAN EXTERNAL SECURITY ORGANIZATION, also known as JSO, also known as Jamahiriya Security Organization, LIBYAN ARAB AIRLINES, LAMEN KHALIFA FHIMA, also known as Mr. Lamin, also known as A Al Amin Khalifa Fhima, ABDEL BASSETT ALI AL-MEGRAHI, also known as Mr. Basset, also known as Abdel Baset Ali Mohmed, also known as Abdel Baset Ali Mohmed Al Megrahi,

*Defendants*.

EMERY CELLI BRINCKERHOFF & ABADY LLP,

*Claimants-Appellants*,

v.

PLAINTIFFS' COMMITTEE,

*Claimants-Appellees*.

1

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before:  LEVAL, CALABRESI, and WESLEY, *Circuit Judges*.

Appeal by Emery Celli Brinckerhoff & Abady, LLP, counsel for certain prevailing plaintiffs in a consolidated action against Libya arising from the 1988 bombing of Pan Am Flight 103, from an order of the United States District Court for the Eastern District of New York (Platt, *J.*) requiring Emery Celli to pay a portion of its negotiated fee to a plaintiffs' committee appointed by the court to oversee the plaintiffs' side of the litigation.  The Court of Appeals (Leval, *J.*) vacates the order and remands for reconsideration by reason of errors in the district court's reasoning.

John S. Martin, Jr., Martin & Obermaier, LLC, New York, NY, for *Claimants-Appellants*.

Steven R. Pounian, Kreindler & Kreindler, LLP, New York, NY, for *Claimants-Appellees*.

LEVAL, *Circuit Judge*:

Emery Celli Brinckerhoff & Abady, LLP ("Emery"), which represented six prevailing plaintiffs in a consolidated lawsuit against Libya arising out of the bombing of Pan Am Flight 103 over Lockerbie, Scotland, appeals from a sealed order of the United States District Court for the Eastern District of New York (Platt, *J.*) ordering it to pay out of the contingency fees it negotiated with its clients a portion consisting of 3% of its clients' recovery (equivalent to $1,440,000, or $240,000 per client) to the plaintiffs' committee appointed by the court to oversee the plaintiffs' side of the litigation.  Emery argues that the district court erred in employing improperly abbreviated procedures to decide the question, committed two prejudicial errors in using letters written by Emery and one of its clients to make findings against Emery about the

2

value of its lobbying for statutory amendments that were crucial to the recovery, and relied illogically on the fact that other differently-situated attorneys willingly contributed a similar amount as persuasive evidence that this fee-sharing formula was fair to Emery. We agree with Emery that the district court made significant errors in justifying its conclusion. Accordingly, we vacate the ruling and remand for further proceedings.

## BACKGROUND

On December 21, 1988, a bomb destroyed Pan Am Flight 103 in flight over Lockerbie in southern Scotland, killing all 259 individuals on board and 11 persons on the ground. Survivors of the deceased brought wrongful death actions in various United States district courts against Pan Am and an affiliate, which provided security services at the originating airport. In April 1989, these cases were consolidated in the Eastern District of New York. The court appointed a plaintiffs' committee to coordinate and oversee the actions of counsel for the plaintiffs in the consolidated proceedings against Pan Am and its affiliate ("*Pan Am* Plaintiffs' Committee"), with Lee S. Kreindler, Esq. serving as lead counsel.

On November 13, 1991, based on the findings of an international investigation, criminal charges were filed against three Libyan officials, accusing them of involvement in the bombing. While the proceedings against Pan Am and its affiliate were still pending, two representatives of decedents brought suit against Libya in the United States District Court for the District of Columbia. One of these two lawsuits was filed by Emery on behalf of Paul Hudson. The other was filed by attorneys Mark Zaid and Allan Gerson on behalf of Bruce Smith. Both cases were transferred to the Eastern District of New York.

Because the Foreign Sovereign Immunities Act ("FSIA") as it existed at the time precluded such suits against sovereign nations, the *Pan Am* Plaintiffs' Committee opposed both lawsuits against Libya. While the cases were pending, Emery's client, Hudson, began lobbying Congress to amend the FSIA to allow federal courts to assert jurisdiction over foreign sovereign states for involvement in terrorist acts. Hudson coordinated his lobbying with Smith and Smith's attorneys. According to unrebutted evidence, Emery, as Hudson's counsel, participated actively in Hudson's lobbying effort, assisting Hudson with his Congressional statements, meeting with members of the Clinton Administration, preparing legal memoranda, and coordinating with Smith's attorneys.

The court dismissed the suits against Libya for lack of jurisdiction in accordance with the then-current version of the FSIA. *Smith v. Socialist People's Libyan Arab Jamahiriya*, 886 F. Supp. 306 (E.D.N.Y. 1995). The judgment of dismissal was then affirmed by this court. *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239 (2d Cir. 1996). However, Congress then amended the FSIA by providing a terrorism exception to the immunity of a foreign sovereign state. *See* 28 U.S.C. § 1605A. As a result, this court issued an order dated February 10, 1997 recalling our mandate and modifying our earlier ruling to allow the district court to entertain the suits against Libya.

Smith and Hudson re-filed their complaints against Libya. In addition, new suits against Libya were filed by other attorneys, including Kreindler and other members of the *Pan Am* Plaintiffs' Committee, on behalf of representatives of other decedents of Flight 103. Emery eventually represented five other plaintiffs, in addition to Hudson, in their case against Libya and

negotiated contingency fee agreements with each client.

The various actions against Libya were again consolidated in the Eastern District of New York. In June 1997, the district court appointed a nine-person plaintiffs' committee for the Libya action ("*Libya* Plaintiffs' Committee"). This *Libya* Plaintiffs' Committee was also chaired by Kreindler and included several other members of the *Pan Am* Plaintiffs' Committee. It did not include Emery. The members of the *Libya* Plaintiffs' Committee, with one exception, had not assisted with the lobbying for amendment of the FSIA.

The *Libya* Plaintiffs' Committee did substantial work on behalf of the class, including successfully defending against defendants' motion to dismiss, *see Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325 (E.D.N.Y. 1998), *aff'd in part*, 162 F.3d 748 (2d Cir. 1998), and negotiating a $2.7 billion settlement, whereby Libya, seeking to end its international isolation, agreed to pay $10 million to the representative of each victim of Pan Am Flight 103.

Ultimately, 269 of the 270 decedents' representatives accepted the terms of the settlement agreement. Of these 269 parties, 240 were represented by members of the *Libya* Plaintiffs' Committee. The remaining 29 parties were represented by fourteen other counsel – six by Emery.

A dispute then arose between the *Libya* Plaintiffs' Committee and the non-Committee counsel over whether the Committee was entitled to receive a portion of the contingency fees received by the non-Committee counsel to compensate Committee counsel for the work done and expenses incurred on behalf of all plaintiffs. Eventually, all non-Committee counsel except Emery agreed to pay the *Libya* Plaintiffs' Committee a portion of the contingency fees they had

negotiated with their clients, equivalent to 3% of the total settlement recovery of each client (*i.e.*, $240,000 per client, for the initial $8 million received by each client).[1] The *Libya* Plaintiffs' Committee used part of these payments to offset a portion of the common expenses advanced by Committee members on behalf of all plaintiffs. It donated the remainder to a nonprofit foundation established in the name of Lee S. Kreindler, which has subsequently used its funds to endow a chair in his name at Harvard Law School and a conference center in his name at Dartmouth College.

Emery refused to pay a portion of its agreed counsel fee to the *Libya* Plaintiffs' Committee, contending that it was entitled to be compensated by the Plaintiffs' Committee for its own work, which benefitted all the plaintiffs. As justification, Emery cited the considerable work that it had done lobbying Congress to amend the FSIA, which had benefitted all the plaintiffs. Emery argued that without this change in law, none of the plaintiffs would have recovered against Libya. Emery also objected to the use of a share of non-Committee counsel's

---

[1] According to the terms of the negotiated settlement, Libya agreed to pay the representative of each victim $10 million in exchange for certain conditions being met by specified dates. One of those conditions was the removal of Libya from the U.S. State Department's list of State Sponsors of Terrorism. Because that condition was not met by the deadline negotiated, Libya withheld payment of the final $2 million for each decedent's representative. Thus, at the time this case was filed, each decedent's representative had received only $8 million.

In May 2006, Libya was removed from the State Department's list of State Sponsors of Terrorism. Libya then paid an additional $2 million to each decedent. Because the order here appealed from was issued prior to these events, no issue arises in this appeal concerning any contribution by Emery to the Committee by reason of its clients' receipt of the additional $2 million.

fees for nonprofit causes unrelated to victims' rights and anti-terrorism, serving instead to glorify Lee S. Kreindler's legacy.

The issue was presented to the district court to rule on whether Emery should be required to share its negotiated fees with the *Libya* Plaintiffs' Committee. The district court ruled that Emery should make the same 3% contribution to the *Libya* Plaintiffs' Committee as made by the other non-Committee counsel. The court rejected Emery's argument that it was entitled to credit for the lobbying and legal work it contributed to the common cause of all plaintiffs. The court justified ordering Emery's contribution to the Committee based on the unprecedented magnitude and complexities of the litigation. In rejecting Emery's argument that it was entitled to credit for its lobbying work, the court relied on two letters: (1) a letter sent by Hudson to the *Libya* Plaintiffs' Committee, with copy to the court, in which Hudson spoke of his own extensive efforts to lobby Congress, and (2) a letter sent by Emery to the court during the course of settlement discussions over fee allocation, in which Emery took the position at the time that a fee contribution to the Committee equal to 3% of its clients' recovery was reasonable in principle but disagreed over the use of these funds. Based in part on adverse findings resulting from the two letters, as well as the willingness of all other non-Committee counsel to make a fee contribution, the district court ordered Emery to pay a contribution to the *Libya* Plaintiffs' Committee equivalent to 3% of Libya's payment to its clients. The court accordingly ordered that Emery contribute to the *Libya* Plaintiffs' Committee payment in the amount of 3% of its clients' recovery, which at the time amounted to $1,440,000, or 21.4%, of Emery's contingency fees. Emery appeals from that decision.

7

## DISCUSSION

A district court's ruling concerning the allocation of attorneys' fees is reviewed on appeal for abuse of discretion. *See*, *e.g.*, *Darner Realty Assocs. LLC v. 136 E. 56th St. Owners, Inc.*, 214 F.3d 79, 87 (2d Cir. 2000). Appellate courts recognize that "the district court, which is intimately familiar with the nuances of the case, is in a far better position to make [such] decisions than is an appellate court, which must work from a cold record." *In re Bolar Pharm. Co. Sec. Litig.*, 966 F.2d 731, 732 (2d Cir. 1992) (per curiam).

**I. The District Court's Conclusion that Emery Must Pay the Same Per-Client Contribution as All Other Non-Committee Counsel**

We find three important deficiencies in the findings of the district court supporting its conclusion that Emery, despite its lobbying efforts, should pay the same per-client contribution to the Committee as other non-Committee counsel. The court relied on three erroneous bases: (1) a letter written by Emery's client, Paul Hudson, used by the court to show that Emery did not do significant lobbying work, (2) a letter written by Emery to the court for the purpose of settlement negotiations, upon which the court relied to discredit Emery's objection to the contribution of fees to the Committee equal to 3% of its clients' total recovery, and (3) the acceptance by other non-Committee counsel of a fee contribution to the Committee equal to 3% of their clients' total recovery, used by the court to support its finding that the same per-client contribution was reasonable in Emery's case. We find that each of these represented an error falling outside the range of the court's permissible discretion.

**A. The Hudson Letter**

Paul Hudson, the legal representative of decedent Melina K. Hudson, was himself a lawyer. He retained the Emery firm as counsel. On October 17, 2003, during the discussions of the allocation of attorneys' fees, Hudson sent a letter to Kreindler, as chairman of the *Libya Plaintiffs' Committee*, with copy to the court, demanding, among other things, that the Committee pay half of his legal fees. In the letter, Hudson pointed to his work lobbying for the FSIA amendment, the benefit all plaintiffs had derived from it, and the Committee's initial hindrance of the litigation he initiated against Libya. Quoting from Hudson's letter, in which he claimed to have done "substantial legal work . . . in lobbying for the legislation," the court concluded, "A disinterested view supports the Committee's position that [Emery] just happened to hitch itself to an enterprising and motivated client with the hope of sharing in his efforts." In other words, the district court concluded on the basis of Hudson's letter that any beneficial lobbying was done by Hudson personally and that his counsel Emery had not contributed significantly to the success of the lobbying effort.

This use of Hudson's letter was impermissible for two reasons. First, the court's interpretation was based on a serious misunderstanding of Hudson's letter, which did not support the conclusion that Emery had not performed valuable lobbying. To be sure, Hudson's letter, designed to claim credit for the lobbying effort, stressed his own contribution, but it did not negate the contribution to the effort by his attorneys. The theory of Hudson's letter – that he was entitled to receive contribution from other plaintiffs and their counsel for his lobbying efforts which brought benefit to all of them – did not depend in any way on whether the lobbying was done by him personally or by the attorneys he hired to assist him. In fact, Hudson's letter

9

expressly referred, although in passing, to work done by Emery in support of the lobbying effort. Considering the nature of its message, along with its explicit text, the letter could not logically be understood as a statement by Hudson that Emery had not contributed valuable services to the lobbying effort.

Furthermore, the district court appears to have ignored, without explanation, an affidavit submitted by Hudson in support of Emery's position, in which Hudson shared credit with Emery for the success of the lobbying effort. Hudson expressly asserted that, "but for the advocacy and legal services of [Emery], at a time when the chance of holding Libya accountable was minimal, the ultimate success of the cases against Libya would not have been realized." He also noted that Emery "undertook substantial risk and incurred significant costs" in seeking to change the law.

Second, even if Hudson' letter had expressly asserted that it was he and not Emery who performed the valuable lobbying, so that Hudson's position in fact had been in conflict with Emery's assertion that it rendered valuable lobbying services, the court could not simply adopt one of two conflicting adverse assertions of fact to defeat the other without some reason for doing so. Where A and B have adverse interests and are in conflict on a question, for a court to say simply that A's statement shows that B is wrong, without any reason for preferring A's version over B's, would be arbitrary and would not satisfy the basic requirements of principled fact finding.

**B. Emery's Settlement Letter**

The court also committed a significant legal error in using a concession made by Emery for purposes of settlement negotiations as the basis of its finding against Emery in violation of

Fed. R. Evid. 408. At one point during the settlement negotiations over fee contributions to be made by non-Committee counsel to Committee counsel, Emery wrote to the court, "Though we believe no surcharge is appropriate in this case, . . . the Plaintiffs['] Committee's proposal to set aside a 3% fee [equivalent to $240,000 per client] from non-Plaintiffs['] Committee counsel to establish a charitable foundation to aid the victims of terrorism is acceptable." The letter further stated that the contribution "appeared to be eminently reasonable and our firm accepted [it] in principle," subject to certain other demands which were eventually not met.[2] On the basis of that letter, the court found, over Emery's objection, that Emery's opposition to the fee contribution was "disingenuous." Emery protests the court's use against Emery of a position it took in settlement negotiations, in violation of a long-standing fundamental rule, memorialized in Fed. R. Evid. 408, which essentially forbids a court from basing adverse findings on a party's concessions in settlement negotiations. *See* Fed. R. Evid. 408 ("[S]tatements made in compromise negotiations regarding the claim" are "not admissible . . . when offered to prove liability for, . . . or amount of a claim that was disputed as to validity or amount"); *see also* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 408.03[1] (Joseph M. McLauglin ed., 2d ed. 2009) ("Rule 408 codifies the long-standing axiom in federal courts that compromises proposed . . . are not evidence of an admission of the validity . . . of the claim or the amount of damage.").

---

[2] Among the unmet demands were Emery's requests that: (1) the charitable foundation be controlled by groups representing the families of the Pan Am Flight 103, rather than Lee S. Kreindler's widow and family, and (2) the funds be distributed to causes serving the interests of victims of terrorism, rather than educational causes in Kreindler's name.

The court gave two reasons for rejecting Emery's objection. Both reasons were invalid. First, the court reasoned that the rule prohibiting the use of statements made in compromise negotiations did not bar its use of this letter because the "letter is drafted to the Court and [is] part of the Court's record." The fact that Emery notified the court of its settlement position did not justify the court's use of that information in a manner forbidden by law. Courts regularly receive information from the parties, including settlement positions, for use for specified purposes. The fact that a court received a communication from a party does not free the court to use its contents in a manner prohibited by law. If the district court's view were correct, parties would act at their peril in revealing their proposed settlement concessions to the court because the court would be free to use those concessions against them in subsequent fact finding.

The district court also reasoned it was free to use Emery's settlement letter because, under authority of *Catullo v. Metzner*, 834 F.2d 1075 (1st Cir. 1987), "compromise offers are admissible to demonstrate intent of the parties or to explain an ambiguity in their agreement." The court misunderstood the *Catullo* precedent, which was directed to a very different problem. In that case, the parties had reached an oral settlement of their dispute. When it became necessary to interpret ambiguities of the settlement agreement without a memorializing writing, the court reasoned that the intent of the settlement could be illuminated and its ambiguities resolved through consideration of what had been said in reaching the settlement. *Id.* at 1078-79. *Catullo* in no way supports the court's use of a party's provisional concessions uttered in an unsuccessful attempt to reach a settlement agreement to support a finding on the merits of the dispute adverse to that party. This is precisely what is forbidden by Rule 408.

12

We emphasize that our conclusion that the court made impermissible use of a settlement concession is not based on the fact that it violated a rule set forth in the Federal Rules of Evidence. Courts have differed over whether or to what extent the Federal Rules of Evidence govern disputes over attorneys' fees.[3] Assuming without deciding that in determining questions of attorneys' fees, courts may employ hearsay within reasonable limits and have considerable discretion over adherence to Federal Rules, the rule forbidding such use of settlement negoations is a matter of fundamental policy. The court essentially used Emery's conditional proposal to accept a particular monetary settlement as the basis for making an award of that amount. Were courts permitted to use provisional settlement concessions in that fashion, the possibilities of negotiating settlement in the future would be seriously impaired. *See* 2 *McCormick on Evidence* § 266 (Kenneth S. Broun ed., 6th ed. 2006) (noting the policy argument for barring the use of "an offer . . . to pay a sum in compromise . . . against that party" is "the promotion of settlement of disputes, which would be discouraged if offers of compromise were admitted"). While a district court enjoys wide discretion in its review of its award of attorneys' fees, the court's actions here exceeded the scope of its discretion. *See* 4 John H. Wigmore, *Evidence in Trials at Common Law* § 1061 (James H. Chadbourn ed., rev. ed. 1972) ("[A] concession which is . . . conditional only can never be interpreted as an assertion representing the party's actual belief.") (emphasis omitted).

**C.  Acceptance by Other Non-Committee Counsel of a Fee Contribution**

---

[3] *Compare In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 584 (3d Cir. 1984) (Federal Rules of Evidence applies to attorneys' fee disputes), *with UAW v. Gen. Motors Corp.*, 235 F.R.D. 383, 387 (E.D. Mich. 2006) (Federal Rules of Evidence do not apply to fairness hearings).

In addition to misuse of the Hudson letter and the Emery settlement letter, the district court provided an additional erroneous rationale for rejecting Emery's objection to a 3% contribution. The district court stated that "[t]he greatest indicator of the reasonableness of the 3% [contribution] is the lack of objection from any [other] non-[C]ommittee counsel . . . including [those] whom [Emery] acknowledges were most responsible for the lobbying efforts." The district court concluded that a fee contribution to the *Libya* Plaintiffs' Committee equal to 3% of the non-Committee counsel's clients' total recovery was reasonable because other non-Committee counsel, including those who had lobbied, were willing to make such a contribution, and Emery had failed to distinguish itself from them.

Given the circumstances, the reasoning was erroneous. First, eleven of the thirteen non-Committee counsel who agreed to contribute 3% did not engage in any lobbying for a change to the FSIA. Their acceptance of the contribution says nothing about the propriety of imposing such a charge on Emery. Nor did the acceptance by Mark Zaid, Esq. and Allan Gerson, Esq., the two remaining non-Committee counsel who did lobby, furnish a reasonable basis for the district court's conclusion because the evidence showed that they accepted the charge not because they considered it reasonable but rather because they reasoned it was more to their advantage to accept it and receive prompt payment than to litigate into the indefinite future in the hope of eventually defeating or reducing the charge. Zaid submitted an affidavit explaining that his agreement to make the 3% contribution "should in no way be construed as an admission" of the fairness of that allocation to those responsible for lobbying Congress for the FSIA amendments which enabled the litigation. Zaid further explained that his acceptance of the contribution was the result of a cost-

benefit analysis. He reasoned that for a solo practitioner, immediate recovery (despite payment of the contribution) was a more attractive option than the likely alternative of a costly protracted legal battle against large, deep-pocketed law firms.[4] While Gerson did not directly testify as to why he accepted the contribution, the evidence strongly suggested it was for the same reason. Zaid stated that he reached the cost-benefit decision in part because of the "persuasive ability of [Gerson] who was in a similar position . . . at the time." The court made no mention of Zaid's submissions.

In short, the willingness of other non-Committee counsel to contribute a portion of their negotiated fees equal to 3% of their clients' total recovery did not support the inference drawn by the district court that it was fair to impose that charge on Emery, notwithstanding its contribution to the success of the other plaintiffs through its lobbying.

In view of the numerous and serious errors in the reasoning which led the district court to impose on Emery a fee contribution equal to 3% of Emery's clients' total recovery, discrediting Emery's claim of entitlement to consideration for its fruitful lobbying effort, we rule that the court exceeded its discretion in making the award and remand the matter for reconsideration. We express no view of the merits of the question.

**II.  Procedural Requirements**

Emery contends that the court erred in adopting impermissibly summary procedures and in failing to compel production of the time records of the Committee counsel.  Although the errors

---

[4] Zaid did not claim that his agreement to make the 3% contribution was the product of coercion or that he intended to repudiate the agreement.

described above were more than sufficient to require remand, we discuss this issue as well because it affects the proceedings to be employed by the court on remand. We reject Emery's contention. As a general proposition, the court was not obligated to conduct more extensive proceedings or in these circumstances to compel production of the Committee counsel's time records.

In reallocating contractually negotiated fees among counsel in a case of this nature, a court is disposing of a property interest. The Due Process Clause generally requires "some form of hearing" in making such a disposition. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). When the case involves attorneys' fees, important considerations favor judicial economy, and the need for more elaborate procedures is often diminished because the court has had the opportunity to observe, and assess the value of, much of the attorneys' contributions. Thus the requirement of "some form of hearing" does not necessarily require an evidentiary hearing at which testimony is taken. *See* Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1278-79 (1975) (the required degree of formality can vary substantially depending on a number of factors including the nature of the proceeding and the rights involved). What is required is that each "affected individual has had a fundamentally fair chance to present his or her side of the story," *In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 611 (1st Cir. 1992) (citation omitted), and to rebut opposing submissions.

The focus of a reviewing court's examination should be on two issues: (i) whether each party had a fair opportunity in view of what is at stake to present its positions, to be apprised of the positions of the opposing claimants and make submissions in opposition to these, and (ii)

16

whether the court's findings and determinations find support in the record and were made in accordance with fundamental principles of fair fact finding. *See id.* at 614-15. Mindful of these principles, we reject Emery's broad claim that the abbreviated procedures used by the district court were inadequate to adjudicate a dispute over the allocation of fees.

On April 18, 2006, the district court held a hearing on the question. The court offered all interested parties an opportunity to present their contentions and to dispute opposing contentions. Emery took advantage of the hearing to make its case and to challenge the *Libya* Plaintiffs' Committees' arguments. At the hearing, Emery did not seek to compel additional testimony or request permission to submit additional briefing or evidence. It only sought production of the *Libya* Plaintiffs' Committee's time records.

Under the circumstances, the district court did not abuse its discretion in declining to compel the *Libya* Plaintiffs' Committee to produce its time records. In assessing the award of attorneys' fees, we have authorized the use of two methods: (i) the lodestar method, focusing on the hours expended in the case, and (ii) the percentage-of-the-recovery method, focusing on the value of the attorneys' contribution. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). The district court chose the latter approach. The time records accordingly had no relevance to the court's determination. If the court was prepared to assume that the time records would support Emery's factual contentions, but would nonetheless conclude that they would have no effect on the court's ruling because the court was proceeding on a different basis to which the time records were irrelevant, then there was no need to allow discovery into an irrelevant issue.

In short, we reject Emery's contention that the court was required to conduct more

17

extensive procedures to adjudicate the allocation of attorneys' fees paid by Emery's clients. On remand, the court should conduct a full review of the record, curing the errors discussed above. It need not, however, conduct additional hearings or more extensive proceedings.

**CONCLUSION**

The order of the district court dated August 29, 2006 requiring Emery to contribute a portion of its fees to the *Libya* Plaintiffs' Committee is hereby VACATED and the case is REMANDED for further proceedings.