**GENE CODES FORENSICS,
INC., Plaintiff,**

v.

**The CITY OF NEW YORK, Defendant.**

**No. 10 CV 1641 (NRB).**

United States District Court,
S.D. New York.

June 24, 2011.

Robert Sidorsky, Esq., Butzel Long, P.C., New York, NY, for Plaintiff.

Gerald E. Singleton, Esq., Law Department, City of New York, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff Gene Codes Forensics ("Gene Codes") brings this diversity action against the City of New York ("City"), asserting causes of action for breach of contract, misappropriation of trade secrets, unfair competition, and unjust enrichment. The City has moved for summary judgment on all of Gene Codes' claims, arguing, in relevant part, that Gene Codes cannot establish that the City misused any of Gene Codes' proprietary information. In opposition, Gene Codes contends that there are genuine issues of material fact that preclude summary judgment and that it should be afforded the opportunity for additional discovery under Rule 56(d) of the Federal Rules of Civil Procedure.[1]

For the reasons stated herein, Gene Codes' request for discovery is denied and

---

1. As further discussed herein, the 2010 Amendments to Rule 56 became effective on December 1, 2010, after this motion was fully briefed. The 2010 Amendments carried forward Rule 56(f) and redesignated it, without significant change, as Rule 56(d).

the City's motion for summary judgment is granted.

## BACKGROUND

### I. Factual Background

The relationship between Gene Codes and the City dates back to at least September 2001, and a brief summary of the relationship will facilitate the discussion of the instant claims.[2]

### A. The Contract

Shortly after the attack on the World Trade Center on September 11, 2001, the Office of Chief Medical Examiner ("OCME"), a City agency, concluded that it would use forensic DNA techniques to identify victims of the attack. OCME also concluded that it needed a database to assist with this identification process. (Lipton Decl. ¶ 3 & Ex. A §§ II–B, III.)

After considering various vendors, the City selected Gene Codes to develop the necessary database and software. (Lipton Decl. Ex. A § II(C)(3).) In the following weeks, Gene Codes began to develop a database and software program called M–FISys (an acronym for "Mass Fatality Identification System" and pronounced "emphasis"). (Lipton Decl. ¶¶ 2–3; Hennessey Aff. ¶ 7; Cash Aff. ¶¶ 6–11.)

During the initial period of work, the parties did not enter into a written contract. However, on March 1, 2002, OCME and Gene Codes entered into a contract for forensic DNA services ("Contract"). (Lipton Decl. Ex. A; Hennessey Aff. ¶ 7; Cash Aff. ¶ 11.) The Contract was for a three-year term and would apply retroactively, covering the period from September 12, 2001 to September 11, 2004. (Lipton Decl. Ex. A § IV.)

Under the Contract, Gene Codes maintained an exclusive license over a previously-developed product called "Sequencher." (Lipton Decl. Ex. A § VII(A).) However, Gene Codes granted OCME a license to use Sequencher and any modifications to that product during the term of the Contract. Following the termination of the Contract, OCME would be required to pay licensing fees for its use of Sequencher. (Lipton Decl. Ex. A § VII(B).)

The Contract also specified the parties' respective rights in the M–FISys program. Specifically, section VII(D) provided:

[i]n the course of performing the services under this agreement, [Gene Codes] shall create source code for middleware which will link the various databases mentioned in this Paragraph VII, may create entirely new software and databases, and may create modifications of its proprietary product 'Sequencher.' *All such middleware, new software, and modifications of Sequencher shall be the exclusive intellectual property of [Gene Codes], although [Gene Codes] shall grant to the OCME a non-exclusive, royalty free, perpetual license to use the*

---

**2.** The background is derived from: Defendant City of New York's Local Rule 56.1 Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried ("R. 56.1"); the declarations of Jody Lipton ("Lipton Decl."), Joseph Palazzi ("Palazzi Decl."), Taylor Dickerson ("Dickerson Decl."), Tejesh Patel ("Patel Decl."), Roni Amiel ("Amiel Decl."), and Mark Desire ("Desire Decl.") in support of defendant's motion for summary judgment, and the exhibits thereto; Plaintiff Gene Codes Forensics, Inc.'s Response to Defendant's Local Rule 56.1 Statement and Statement of Additional Material Facts As To Which There Is No Genuine Issue To Be Tried ("Counter R. 56.1"); the affidavits of Francis Sullivan ("Sullivan Aff."), Elaine Mar ("Mar Aff."), Thomas Kubit ("Kubit Aff."), Michael Hennessey ("Hennessey Aff."), and Howard Cash ("Cash Aff.") in opposition to defendant's motion for summary judgment, and the exhibits thereto. Unless otherwise noted, the facts recited herein are not subject to material dispute.

*middleware and software* so created for noncommercial purposes. . . .

(Lipton Decl. Ex. A § VII(D) (emphasis added).) OCME also represented that it would "execute, acknowledge, and deliver" to Gene Codes all papers "as may be necessary to evidence the allocation of ownership rights in the intellectual property" as specified in sections VII(B) and VII(D) of the contract. (Lipton Decl. Ex. A § VII(E).)

In addition, the Contract contained a provision that governed the parties' treatment of confidential information. Pursuant to section VI(G):

> [b]oth parties agree to maintain the confidentiality of the disclosing party's confidential information by using methods at least as stringent as each party uses to protect its own confidential information. In this subparagraph, 'confidential information' shall include all information marked confidential which is exchanged between the parties hereto as well as all information related to the fees or expenses paid hereunder. . . .

(Lipton Decl. Ex. A. § VI(G).)

In exchange for the services provided by Gene Codes under the Contract, the City paid Gene Codes approximately $13 million. (Lipton Decl. ¶ 4 & Ex. A.)

### B. Raw Data

During the term of the Contract, OCME delivered DNA profile data to Gene Codes to be imported into the database. (R. 56.1 ¶ 3; Counter R. 56.1 ¶ 3.) Such data are indisputably the property of OCME. (Lipton Decl. ¶ 6 & Ex. B; R. 56.1 ¶ 2; Counter R. 56.1 ¶ 2.)

Following its receipt of the DNA profile data, Gene Codes would format and upload the data into the M–FISys database. (Dickerson Decl. ¶ 5; Desire Decl. ¶ 9; R. 56.1 ¶ 4; Counter R. 56.1 ¶ 4.)

### C. Post–Contract

After the term of the Contract expired in late 2004, the parties did not renew their agreement. (Hennessey Aff. ¶¶ 19–22; Cash Aff. ¶¶ 22–24.) However, OCME continued to use the M–FISys database and software and Gene Codes continued to provide certain assistance and services to OCME. (Kubit Aff. ¶¶ 5–6; Hennessey Aff. ¶¶ 23–25; Cash Aff. ¶ 65.)

In August 2009, OCME elected to use a different DNA matching program for its World Trade Center victim identification work. (Desire Decl. ¶ 5.) Specifically, OCME elected to use a new version of the Combined DNA Index System ("CODIS"), a program developed by the Federal Bureau of Investigation ("FBI"). (Desire Decl. ¶¶ 4–5.) The new version of CODIS, CODIS 6.0, was developed after M–FISys and became available for use in 2008. (Desire Decl. ¶ 5.) The FBI permitted state and local law enforcement laboratories throughout the United States to use CODIS free of charge. (Desire Decl. ¶ 4.)

To complete the transition to the new program, OCME had to migrate its data from M–FISys to CODIS 6.0 and had to format the data in a manner that CODIS would recognize. (Palazzi Decl. ¶ 5; Patel Decl. ¶ 4.) However, the M–FISys program lacked a tool that would enable OCME to easily extract its DNA profile data from the database. (Dickerson Decl. ¶ 6; R. 56.1 ¶ 7; Counter R. 56.1 ¶ 7.) Additionally, by late 2009, the M–FISys database had become inaccessible using the related software.[3] (Amiel Decl. ¶¶ 9–

---

3. The parties spend a significant amount of time disputing the reasons why the M–FISys software ceased to work and the why the software lacked a tool that would enable the ready extraction of raw data from the database. We need not delve into the specifics of the parties' contentions because they are not material to the motion pending before us.

10; R. 56.1 ¶ 6; Counter R. 56.1 ¶ 6.) Thus, to access the data and facilitate the migration to CODIS 6.0, OCME personnel printed out all of the tables contained in the M–FISys database. (Amiel Decl. ¶ 11; Palazzi Decl. ¶¶ 6–7.)

After printing out the tables, two OCME employees, Joseph Palazzi and Taylor Dickerson, analyzed the printouts to identify the raw DNA profile data. (Palazzi Decl. ¶¶ 7, 10; Dickerson Decl. ¶ 7.)

## II. Procedural Background

### A. Complaint

Gene Codes commenced this action on March 1, 2010. In its complaint, Gene Codes alleged on information and belief that OCME printed out the so-called "database schema" of the M–FISys database and shared those print-outs with the FBI. According to Gene Codes, the City shared this proprietary information to assist the FBI in developing its own database.[4] (Complaint ("Compl.") ¶¶ 28–30.)

As noted above, Gene Codes asserts four state law causes of action in its complaint: first, Gene Codes asserts a claim for breach of contract, alleging that OCME breached its obligations to Gene Codes under sections VI(G), VII(D), and VII(E) of the Contract, which govern the treatment of confidential information and specify the parties' respective rights in the software and database; second, Gene Codes asserts a claim for misappropriation of trade secrets, alleging that the schema of the M–FISys database was a protectable trade secret and that OCME shared the schema with the FBI; third, Gene Codes asserts a claim for unfair competition, alleging that OCME improperly disclosed Gene Codes' confidential information to the FBI to enable the FBI's CODIS software to unfairly compete with Gene Codes' M–FISys software; and fourth, Gene Codes asserts a claim for unjust enrichment, alleging that OCME unfairly received the benefit of Gene Codes' trade secrets and confidential information. (Compl. ¶¶ 28–30, 37–53.)

### B. Motion for Summary Judgment

In a letter dated April 28, 2010, the City sought leave to file a pre-discovery motion for summary judgment on the ground that Gene Codes' complaint lacked any factual basis. On May 27, 2010, the parties appeared for an initial pretrial conference. At the conference, Gene Codes responded to the City's argument regarding the absence of a factual basis for its complaint by informing the Court that its allegations

---

4. A database schema is "an electronic index that shows how the data in a database are organized by listing the database's fields and tables, but not its underlying data." *Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256, 263 (S.D.N.Y.2008); *see also Merch. Transaction Sys., Inc. v. Nelcela, Inc.*, No. CV 02–1954–PHX–MHM, 2009 WL 723001, at *9 n. 11 (D.Ariz. Mar 17, 2009) ("A database schema is the organization and names that the programmer uses to establish a computer database and to reference data stored in the database.") (internal quotations omitted); *DSMC, Inc. v. Convera Corp.*, 479 F.Supp.2d 68, 74 n. 6 (D.D.C.2007) ("The term 'database schema' or 'schema' refers to the organization of data within a database. The schema may be represented as a diagram that shows the various tables in a database, and within each table identifies the fields and their definitions. The complete schema, however, is typically an electronic file that includes details of all the tables, fields and relationships in the database.") (internal quotations and citations omitted).

According to Gene Codes, OCME personnel printed out the structure and organization of the M–FISys database, shared that schema with the FBI, and then worked directly with the FBI "for the purpose of enabling the FBI to extract [Gene Codes'] Trade Secrets, including proprietary know-how and design functions, in order to develop and enhance the functionality of CODIS 6.0 ..." (Compl. ¶ 29.)

were based on statements made by a confidential source who was employed by OCME. In response, this Court advised Gene Codes that it should submit an affidavit from the confidential source that described the source and his expertise with sufficient particularity to indicate that the allegations in the complaint were plausible. The Court ordered Gene Codes to submit an affidavit within three weeks and made clear that Gene Codes need not identify its source by name.

On June 10, 2010, Gene Codes submitted a letter advising the Court that the confidential source was not willing to submit an affidavit. However, Gene Codes sought leave to depose an OCME employee: Joseph Palazzi ("Palazzi"). In support of its request to depose Palazzi, Gene Codes asserted that Palazzi had communicated with the confidential source, and had informed the confidential source that OCME had provided a printout of the M–FISys database structure to the FBI.

On June 17, 2010, after additional letter submissions, the Court reiterated that it was Gene Codes' obligation to provide a substantiated basis for the allegations in its complaint and that Gene Codes had, to that point, failed to provide the Court with a basis for concluding that the confidential source was a credible source of information. In the same letter, the Court denied Gene Codes' request to depose Palazzi, advised Gene Codes to reconsider the possibility of providing an affidavit from the confidential source, and ordered Gene Codes to provide an update by June 25, 2010. The Court repeated that the affidavit need not name the source but should contain adequate detail regarding the source's factual knowledge, position, and expertise to indicate that the allegations in the complaint were plausible.

On June 25, 2010, Gene Codes informed the Court that the confidential source remained unwilling to submit an affidavit. After noting that Gene Codes believed that it had identified two other witnesses who could support the allegations in the complaint, Gene Codes requested an additional thirty days to interview the two individuals and to file an amended complaint. The Court granted Gene Codes' request.

After the thirty-day extension, Gene Codes informed the Court that it was unable to obtain new sources of information for the purpose of supplementing, corroborating, or amending the complaint. However, Gene Codes submitted an affidavit from its President, Howard Cash ("Cash"), which recounted, among other things, Cash's discussions with the confidential source.

On July 29, 2010, the City renewed its request to file a motion for summary judgment and the Court later granted that request. In its motion, the City makes two principal and related arguments: first, the Court should grant the City's motion for summary judgment on all of Gene Codes' claims because Gene Codes cannot establish a critical element of each of the claims—namely, that the City misused Gene Codes' trade secrets or confidential information (D. Mem. at 8–13); and second, the Court should not permit discovery under Federal Rule 56(d) because Gene Codes' allegations are wholly speculative and because Gene Codes has not made a proper showing that it is entitled to discovery. (D. Mem. at 14–15.)

In opposition, Gene Codes contends that summary judgment should be denied for a number of reasons, including: first, the schema or organization of the M–FISys database constitutes protectable trade secrets and/or confidential information (P. Mem. at 8–9); second, there exists a genuine issue of material fact regarding whether the City shared a print-out of the M–FISys database with the FBI (P. Mem. at

10–13); and third, Gene Codes should be permitted discovery under Rule 56(d), which would include taking the deposition of Palazzi. (P. Mem. at 15–18.)

In support of the argument that the City misused Gene Codes' information, Gene Code makes three specific assertions: first, that the confidential source informed Cash that print-outs of the M–FISys database were shared with the FBI; second, that, according to Cash, Palazzi stated in a settlement conference that Palazzi showed the print-outs to the FBI, albeit with certain information stripped out; and third, that the City's proffered explanation for printing out the database—i.e., that it was the most practical way to access the raw data—is implausible because the City could have asked Gene Codes to extract the data or because the City could have pieced together the data from other sources. (P. Mem. at 10–15.)

In reply, the City argues, inter alia, that Gene Codes has relied on inadmissible evidence in support of its contention that there is a genuine issue of material fact regarding the City's alleged misuse of Gene Codes' information.

### C. The "Confidential" Source

The Court scheduled oral argument for late May 2011. Shortly before oral argument, the City informed the Court that in January 2011, an OCME employee reported to his supervisor that he believed he was the so-called confidential source. However, according to the City, that individual stated that he had no knowledge of OCME sharing any information with the FBI. On May 23, 2011, the Court adjourned oral argument and permitted the City to submit an affidavit from that individual.

Three days later, the City submitted the Supplemental Declaration of Paul Goncharoff in support of its motion for summary judgment ("Goncharoff Decl."). In his declaration, Goncharoff states that he believes that he is the so-called confidential source. (Goncharoff Decl. ¶ 2.) He then details his background in forensic molecular biology and his work experience at OCME.[5] (Goncharoff Decl. ¶¶ 1–5.) Goncharoff further states that he has "no specialized training or expertise in computer science or computer programming[,]" that he never worked with the M–FISys program or on World Trade Center cases, and that he does not have "any general or special knowledge from other sources regarding the functioning of M–FISys or the organization and structure of the [World Trade Center] database." (Goncharoff Decl. ¶ 4.)

Additionally, Goncharoff attests that he has long been friends with Elaine Mar, who is the wife of Cash and a former OCME employee. (Goncharoff Decl. ¶ 7.) According to Goncharoff:

[d]uring a telephone conversation I had with Elaine Mar in September or October 2009, I mentioned having seen a chart with box diagrams sitting on a desk outside my office, but I otherwise have no recollection of the context or reason for the remark, and recall nothing about the chart other than the fact that it had the word "mito" in one of the boxes.... I might have mentioned Joseph Palazzi's name because we have adjoining offices and the chart was actually on an empty work station desk located outside his office.

(Goncharoff Decl. ¶ 8.) In addition, Goncharoff explicitly rebuts two points made in Cash's affidavit: first, he states that

---

**5.** As noted above, Goncharoff's specific area of expertise and interest is in mitochondrial DNA, which may be referred to as "mito." (Goncharoff Decl. ¶ 5.) Mitochondrial DNA is one of three types of DNA that was imported into the M–FISys database. (Cash Aff. ¶ 37.)

Palazzi never said that he "was printing out the M–FISys data structures to help the FBI write software similar to M–FI-Sys," (Goncharoff Decl. ¶ 9 (citing Cash Aff. ¶ 73)); and second, Goncharoff attests that he never communicated such information to Cash. (Goncharoff Decl. ¶ 9.)

In his declaration, Goncharoff also states that, while visiting Cash and his wife during a road trip, Cash brought Goncharoff to an attorney without prior notice. Goncharoff, who "was completely dumbfounded and taken by surprise by the meeting," states that he was asked to describe the chart in detail to Cash and Cash's lawyer, but was unable to do so and only recalled that the chart had the word "mito" on it. (Goncharoff Aff. ¶ 12.)

Goncharoff further attests that he refused to submit a signed "John Doe" affidavit on behalf of Gene Codes in this case "because I have no knowledge or information that supports Gene Codes' claim of information being shared by OCME with the FBI. I had no knowledge or information other than that I had seen a chart with a box diagram that contained the word 'mito.' " [6] (Goncharoff Aff. ¶ 16.)

On June 1, 2011, Cash submitted a supplemental affidavit ("Cash Supp. Aff."), in which he confirms that Goncharoff was his confidential source but adheres to his version of the events. In his supplemental affidavit, Cash states that he surreptitiously taped a lunch conversation with Goncharoff and the recording, which he tran-

scribed and provided to the Court. (Cash Supp. Aff. ¶ 8.) According to Cash, the transcribed conversation supports Gene Codes' contention that the City misused its trade secret and confidential information.[7] (Cash Supp. Aff. ¶ 23.)

## DISCUSSION

### I. Legal Standards

#### A. Federal Rule 56(a)

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see also Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

On a motion for summary judgment, the initial burden rests with the moving party to make a prima facie showing that no

6. Goncharoff continues:
 In reading Howard Cash's affidavit, it is clear to me that he took an offhand remark from a conversation I had with Elaine [Mar], the context of which I do not recall, and used it to support his notions of OCME misconduct. I reiterate that I have no knowledge of any sharing of information concerning M–FISys by the OCME with the FBI.
 (Goncharoff Decl. ¶ 18.) Goncharoff later notes that he signed the affidavit "voluntarily

without any fear of reprisals or adverse employment consequences based on my prior conduct." (Goncharoff Aff. ¶ 19.)

7. Within two weeks of the date of this Memorandum and Order, Gene Codes shall file under seal an unredacted version of the transcript discussed herein, which is dated November 5, 2009, and which Gene Codes provided to this Court on June 1, 2011.

material fact issues exist for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 330–31, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this showing is made, "[t]o defeat summary judgment, the non-movant must produce specific facts" to rebut the movant's showing and to establish that there are material issues of fact requiring trial. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998) (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548). In determining whether a genuine issue of material fact exists, a court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. *See Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010).

Additionally, in determining the appropriateness of a grant of summary judgment, we may rely only on admissible evidence. *Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir.2004) (citing *Feingold v. New York,* 366 F.3d 138, 155 n. 17 (2d Cir.2004); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 269 F.3d 114, 123 (2d Cir.2001)).

### B. Federal Rule 56(d)

Pursuant to Rule 56(d), if a party opposing a motion for summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed.R.Civ.P. 56(d) (effective Dec. 1, 2010). As previously noted, prior to December 2010, the substance of Rule 56(d) was contained in subsection (f) of Rule 56.

According to the notes of the Advisory Committee on the 2010 amendments, "[s]ubdivision (d) carries forward without substantial change the provisions of former subdivision (f)."

■ In this Circuit, it is well-settled that a party seeking additional discovery under former Rule 56(f) must file an affidavit in support of its request for discovery. An affidavit pursuant to former Rule 56(f) must describe: "(1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Shaheen v. Naughton,* 222 Fed.Appx. 11, 13 (2d Cir. 2007) (citing *Gualandi v. Adams,* 385 F.3d 236, 244 (2d Cir.2004)).

■ "A reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit, and the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994) (internal citations omitted); *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir.1985) ("A memorandum is not a substitute for an affidavit under Rule 56(f) ...."). Likewise, a "[b]are assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f)." *Lerwick v. Kelsey,* 150 Fed.Appx. 62, 65 (2d Cir.2005) (citing *Paddington Partners,* 34 F.3d at 1138).[8]

---

8. Because we are aware of no principled reason to depart from the Rule 56(f) jurisprudence, we apply these well-settled legal principles to the instant inquiry. *Cf. Platinum*

## II. Analysis

As noted above, Gene Codes advances two principal arguments, which we address in turn.

### A. Rule 56(a)

Gene Codes argues that there is a genuine issue of material fact regarding OCME's misuse of Gene Codes' confidential information and/or trade secrets. According to Gene Codes, because of this genuine dispute, the City's motion for summary judgment should be denied.

 Consistent with the City's argument, each of Gene Codes' four causes of action requires proof that the City misused Gene Codes' information, either as proof of an essential element of the claim, as proof of a breach of the Contract, or as proof of the City's enrichment. *See, e.g., Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 302 & n. 8 (2d Cir.2006) ("In order to succeed on their misappropriation and unfair competition claims, plaintiffs must establish some wrongful appropriation or use of the plaintiffs' intellectual property .... Whatever the breadth and flexibility of [an unfair competition claim under New York law] [ ], it depends upon the allegation of facts that, if true, would constitute misuse of plaintiffs' property."); *Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir.2000) ("To prevail on a breach of contract claim under New York law, a plaintiff must prove (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.") (internal quotations omitted); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir.1999) ("To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."); *see also Diesel Props S.r.l. v. Greystone Bus. Credit II, LLC*, 631 F.3d 42, 55 (2d Cir.2011) ("In order to succeed on a claim for unjust enrichment under New York law, a plaintiff must prove that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.") (internal citations and quotations omitted).[9] Accordingly, if the City makes a showing that there is no issue of material fact concerning the City's purported misuse of Gene Codes' information, and if Gene Codes fails to rebut that showing, then the City is entitled to summary judgment on each of Gene Codes' four claims.

Through its affidavits from OCME personnel, the City has plainly carried its initial burden of showing that no material

---

*Funding Servs., LLC v. Petco Insulation Co., Inc*, No. 3:09cv1133 (MRK), 2011 WL 1743417, at *13 (D.Conn. May 2, 2011) (applying Rule 56(f) standards to amended Rule 56(d)); *Brown v. Pritchard*, No. 09 Civ. 214S, 2011 WL 542226, at *4 (W.D.N.Y. Feb. 8, 2011) (same); *Cornell v. Kapral*, No. 5:09–CV–0387 (GTS/ATB), 2011 WL 94063, at *4 & n. 2 (N.D.N.Y. Jan. 11, 2011) (same).

9. Under New York law, when a valid and enforceable written contract governs a particular subject matter, a plaintiff may not recover for both breach of contract and unjust enrichment. *See Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572, 807 N.Y.S.2d 583, 841 N.E.2d 742 (2005) ("[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter") (quoting *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)). Here, Gene Codes relies on the validity and enforceability of the Contract, plainly calling into question the viability of its unjust enrichment claim.

fact issues exist on the issue of misuse. (Palazzi Decl. ¶¶ 3, 11, 13; Dickerson Decl. ¶¶ 8–9; Patel Decl. ¶¶ 3, 5.) Thus, in order to establish that a genuine issue of fact exists for trial, Gene Codes must identify specific, admissible facts regarding the City's purported improper use of Gene Codes' information.

■ In its endeavor to rebut the City's showing, Gene Codes relies on three factual assertions, two of which are inadmissible and not properly considered here. First, Gene Codes relies on Cash's affidavit, in which Cash attests that the confidential source stated that OCME personnel shared a print-out of the M–FISys database with the FBI. Putting aside the fact that we now know that the so-called confidential source is Goncharoff, and that Goncharoff has now submitted a sworn affidavit stating that he never made any such statements, Cash's statement regarding what Goncharoff told him is hearsay and not admissible pursuant to any hearsay exception. *See* Fed.R.Evid. 801(c), 802; *see also Feingold,* 366 F.3d at 155 n. 17 (hearsay testimony not properly considered when reviewing a motion for summary judgment); *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir. 1999) (hearsay not competent evidence in opposition to a motion for summary judgment). Thus, this Court may not consider this evidence when considering whether Gene Codes has put forward specific facts regarding the City's alleged misuse of information.

■ Second, Cash attests that Palazzi admitted in a settlement conference that he showed a print-out of the M–FISys database to the FBI. Again, however, this statement, assuming it were made, is inadmissible, *see* Fed.R.Evid. 408, and is not offered for any use permitted under Federal Rule of Evidence 408(b). Therefore, Palazzi's purported statement cannot be used to create a genuine issue of material fact.

Third, Gene Codes contends that the City's justification for printing out the data from the M–FISys database defies logic because the City could have pieced together the data from other locations or could have asked Gene Codes to extract the data. However, such conjecture does not create a genuine issue of material fact regarding the City's use or misuse of the data.

As noted above, the DNA profile data belong to the City and, in its briefing and at oral argument, the City articulated reasons why it elected to print out its data rather than extracting or retrieving its data in another fashion. In short, the City explained that after the data were uploaded from numerous sources to the M–FISys database, OCME employees filtered that data, eliminated data that were not useful for forensic DNA identification purposes, and otherwise cleaned up the data set. Thus, if the City were to revert to the original sources, not only would the City have to combine disparate sources of data again, but it would also lose nearly a decade's worth of work performed by OCME personnel. To require OCME to extract its data from the numerous original sources, as Gene Codes suggests, would deprive the City (and in turn the citizenry) of the benefits of the $13 million payment to Gene Codes and the fruit of hundreds or thousands of man-hours of work performed by City employees. In addition, the City explained that it declined to ask Gene Codes to extract the data because its relationship with Gene Codes had soured.

In short, the City has proffered a reasonable explanation for the method it chose to retrieve its data. This explanation undermines Gene Codes' argument that, because other methods of data retrieval possibly existed, the City must have

done something improper here. Any suggestion by Gene Codes that it is entitled to dictate to the City how it should have collected its own data is unacceptable. Indeed, even if OCME's decision to print out the data proved to be costly, time-consuming, or ill-advised, that does not bear on whether the City in fact shared any confidential information or trade secrets with the FBI.

Thus, because Gene Codes has failed to identify specific facts concerning the City's misuse of Gene Codes' information, summary judgment should be granted unless Gene Codes' has carried its burden under Rule 56(d).

## B. Rule 56(d)

Next, Gene Codes contends that it is entitled to discovery under Federal Rule 56(d), and therefore summary judgment should not be awarded until Gene Codes has had an opportunity to further develop the facts.

■ In contrast to the inquiry under Rule 56(a), a court may consider inadmissible evidence when considering whether a party is entitled to discovery under Rule 56(d). *See Valley Nat'l Bank v. Greenwich Ins. Co.*, 254 F.Supp.2d 448, 461 (S.D.N.Y.2003). As discussed above, however, to make a proper showing under Rule 56(d), the party seeking additional discovery must specify in an affidavit: what discovery it seeks and how it will obtain that discovery; how those facts are

reasonably expected to raise a genuine issue of material fact; what efforts have been made to date to obtain this discovery; and why the earlier efforts were unsuccessful.

■ Here, Gene Codes has failed to submit such an affidavit. Rather, Gene Codes has simply stated in its memorandum of law that it wishes to depose Palazzi. Yet the Second Circuit makes clear that such a statement is not an adequate substitute for an affidavit detailing the above-mentioned facts. *See Paddington Partners*, 34 F.3d at 1137. Indeed, the failure to submit an affidavit alone could be grounds for denying Gene Codes' request for discovery under Rule 56(d). *Id.*

■ Nevertheless, looking to the merits of Gene Codes' request, we remain unconvinced that additional discovery under Rule 56(d) is warranted. Gene Codes relies heavily on the purported statements of Goncharoff. However, Goncharoff now denies ever learning the facts attributed to him, making the statements to Cash that Cash says that the source made, or having the technical background and skill to make such statements in a literate and adequately-informed manner.

Indeed, even the surreptitiously-taped conversation fails to justify additional discovery. In the taped conversation, Goncharoff states that he was unfamiliar with the M–FISys software and, critically, asks Cash what a "database schema" is.[10] And

---

**10.** The conversation is transcribed as follows:

MR. CASH: ... And then when [OCME's] system broke down, which now—in August—knowing what I know now is probably because they were trying to hack the system. *That's probably how they broke it down, when they were trying to get the database schema out, which can be done.*

MR. GONCHAROFF: *What does that mean, "database schema"?*

MR. CASH: Well, there are two different parts of the software. There's the stuff that does the analysis of the data, so they can—

MR. GONCHAROFF: Like Sequencher.

MR. CASH: Yeah. So it'll line up the fragments that match, looking for conflicts .. and then there's some filing system you set up to keep the information together ... You never show up at the conferences where—*have you ever seen M–FISys on [inaudible]* ?

MR. GONCHAROFF: [inaudible]

not only does Goncharoff lack the technical proficiency to make the statements attributed to him by Cash, but a close review of the transcript reflects that Cash has taken liberties when referencing Goncharoff's statements. Although Gene Codes attributes the most nefarious of interpretations to Goncharoff's statements, Goncharoff merely observes that he saw a print-out near Palazzi's office with the word "mito" on it, that FBI personnel were present in OCME's offices, and that he "think[s]" that OCME wanted to have an "integrated system like M–FISys." (Tr. 13–15.) Even if Gene Codes had marshaled these statements into a Rule 56(d) affidavit, we would conclude that Gene Codes' position was too speculative to justify deferring the City's motion for summary judgment, denying the motion, or otherwise permitting discovery before reaching the merits of the City's argument. Indeed, the bottom line is that Goncharoff simply cannot be the predicate for Gene Codes' claim that OCME shared any trade secrets or confidential material with the FBI.[11]

Similarly, Gene Codes' attempt to rely on Palazzi's purported statement at a settlement conference is equally unavailing. Palazzi clearly states in his affidavit that he never shared information concerning the organization of the M–FISys database with the FBI. (Palazzi Decl. ¶¶ 3, 11, 13.) Thus, we are presented with a situation where a purported statement is plainly inadmissible, where the rule prohibiting the use of statements made in settlement discussions is a matter of "fundamental policy," *Rein v. Socialist People's Libyan*

*Arab Jamahiriya*, 568 F.3d 345, 351–53 (2d Cir.2009), where the supposed declarant has submitted a sworn declaration under penalty of perjury in which he denies sharing Gene Codes' information with the FBI, and where there exists a legitimate question of whether the complaint even meets the necessary pleading requirements. In this situation, we cannot conclude that Palazzi's purported statement justifies further discovery.

Finally, for the reasons previously noted, Gene Codes' argument that the City could have—and should have—extracted its data in another fashion does not warrant discovery under Rule 56(d).

In sum, the law is very clear that you cannot use discovery to find out whether you have a claim. *See, e.g., Lyeth v. Chrysler Corp.*, 929 F.2d 891, 899 (2d Cir. 1991) (affirming district court's order preventing Chrysler from taking discovery and granting Lyeth's motion for summary judgment and reasoning that "the district court did not err when it observed that Chrysler was simply 'engaging in a fishing expedition in an attempt to determine if there is some basis, however farfetched, to prosecute a claim of bias.'"); *Waldron v. Cities Serv. Co.*, 361 F.2d 671, 673 (2d Cir.1966) ("The court quite properly denied the Rule 56(f) motion for further discovery by which plaintiff sought to engage in still another 'fishing expedition' in the hope that he could come up with some tenable cause of action."), *aff'd sub nom. First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569

MR. CASH: *I'll show you sometime.*
MR. GONCHAROFF: I just remember the times when I used to visit Elaine and I would see it open and—from time to time she would show me, or I would just see how, the work that she was doing.
(Transcript dated Nov. 5, 2009 ("Tr.") at 17–18) (emphasis added).

11. Because of the present posture of the case and the motion pending before us, we need not decide the question lurking immediately below the surface: whether the complaint would state a claim or pass muster under Rule 11 if it were revised to confirm with the state of the record as presently developed.

(1968). We will not permit a fishing expedition to occur here.

### CONCLUSION

For the foregoing reasons, the City's motion for summary judgment (docket no. 11) is granted.